# EXHIBIT A

UNITED STATES OF AMERICA

MERIT SYSTEMS PROTECTION BOARD

DENVER FIELD OFFICE

| | |
|---|---|
| TJ ZUECH,<br>Appellant,<br>v.<br>DEPARTMENT OF THE AIR FORCE,<br>Agency. | DOCKET NUMBER:<br>DE-0752-23-0253-I-1,<br>DE-0752-23-0270-I-1<br><br>October 31, 2023<br>9:08 A.M. |

TRANSCRIPT OF HEARING
BEFORE ADMINISTRATIVE JUDGE DAVID BROOKS

APPEARANCES:

For the Appellant: By: David J. Holdsworth, Esq.
Law Office of David J. Holdsworth
9125 Monroe Plaza Way
Suite B
Sandy, UT 84070

For the Agency: By: Dustin W. Smith, Esq.
Civil Law Division, 75 ABW/JA
6026 Cedar Lane
Building #1278
Hill AFB, UT 84056

Court Reporter: Jill Piper
eScribers LLC
7227 N 16th Street, Suite 207
Phoenix, Arizona 85020

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

I N D E X


| | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| WITNESSES FOR AGENCY: | | | | |
| Laura Haislip | 5 | 15 | | |
| Lori Masero | 20 | 71 | | |
| Aimee Tarbet | 87 | 116 | | |
| Marc Ybaben | 122 | 138 | 144 | |
| WITNESSES FOR APPELLANT: | | | | |
| Trevor Taylor | 146 | 151 | | |
| TJ Zuech | 153 | 202` | | |
| Natalie Zuech | 214 | | | |

Deleted: 153¶

JUDGE BROOKS: Okay. During your testimony, if you have questions or are confused, you should direct any questions you have to me. Would you raise your right hand for the oath?

TJ ZUECH, APPELLANT'S WITNESS, SWORN

(Witness testifies telephonically)

JUDGE BROOKS: Would you please state and spell your name?

THE WITNESS: My name is TJ Zuech. It's the letters T and J. Last name is Z-U-E-C-H.

JUDGE BROOKS: I got that well enough, but you might have to speak up or be closer to the microphone, depending on how this goes with the volume.

THE WITNESS: Okay.

JUDGE BROOKS: The first party that will ask you questions is your attorney. Wait. Wait a minute.

Is that okay, Mr. Smith?

MR. SMITH: Yeah. Thank you, Judge.

JUDGE BROOKS: Okay. The first party that will ask you questions is your attorney, Mr. Holdsworth.

You can begin, sir.

MR. HOLDSWORTH: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. HOLDSWORTH:

Q So TJ, could you take us back to the conversation that you had with Laura Haislip at the union office? Remember that?

Deleted: 154¶

A Yes, I do.
Q Tell us how did that conversation come about?
A So that morning, I knew that I was going to file two grievances against my management, and I was going to go into the union office. And I ended up having a dream, obviously, the vivid dream and everything else, that really freaked me out and that I needed to -- I felt that I needed to explain it to my union representative to get it across to my management that I didn't feel -- I wa -- I wasn't in the right state of mind in order to return back to work.

So when I went into Mr. Johnson's office that morning, I sat down, and he was talking to me and asked me what was going on, and I let him know that I needed to file two different grievances. And he said, okay, what's going on? So I just explained to him, you know, the mistreatment or harassment and that everything had been just building up from -- from before. And he's like, okay, you know what, hang on just a second. And then he left his office. And that's where he went and talked to Laura, I'm guessing, and then came back into his office.

Me and him chatted for another two or three minutes and then we ended up getting on the phone with the HR specialist, Mark -- Mark Burrows. He ended up getting on the phone with him to let him know what was going on. And then that's when Laura walked in, and she introduced herself as the

Deleted: 155¶

union representative for workers' comp cases that deal with mistreatment, harassment, retaliation or rebuttal, yeah, against employees. So I felt comfortable enough that, you know, she's a union representative that I just needed to get this off my chest. And as she stated, I was completely scatterbrained, because I just had this dream that literally is a nightmare to anybody, I'm sure, and I didn't know what to do with it. And I --

Q What did you tell her?

A I told her that I've been consistently harassed and tormented through my time with my child and my newborn through my PPL, that I've been denied leave, that --

Q And we're going to go over those things. But -- so I won't ask you specifically at this point what you meant by that, but what did you tell Laura about what you dreamed?

A I told her specifically it's bad enough that I'm having dreams, and I had a vivid dream last night, that I ended up shooting my supervisor.

Q Did you say killing or shooting?

A Shooting.

Q All right. So it's clear that you were talking about the dream that you had had.

A Yes.

Q And why did you feel comfortable in sharing that type of the dream with Ms. Haislip?

A Because I felt that any conversation with the union representatives are a -- in like a protected group, that this is -- it's kind of like a -- a counselor, your personal health information, that kind of stuff, that I felt that what I was going -- what I was telling them was between us, not between anybody else to be spread as gossip or anything like that.
Q Did Ms. Haislip tell you that she, in a few days, was going to be -- going to work for the management as a labor relations specialist?
A No, she did not.
Q All right. Anything else that you talked about with her in that conversation with her?
A She just stated that I'm sorry that you're going through this, and it's definitely not right what your management's doing to you, and I'm sorry.
Q Anything else we discussed?
A That was -- that was all, and she ended up leaving, and Bruce got off the phone.
Q And what did you tell the Bruce about the dream?
A Yes, I repeated what I told Laura the same thing; just that I've been having more anxiety, more depression, and that it's bad enough that I had a dream last night that I ended up shooting my supervisor.
Q And what was his response?
A His response was, well, we don't need to be having things

Deleted: 156¶

Deleted: 157¶

like that around here.
Q Did you ever take any action to carry out what the -- what you had dreamed about, I think this was the night before.
A Yes, the night before.
Q Did you do anything that carry any of that out?
A Absolutely not.
Q Make any plans?
A No.
Q Make any threats?
A No.
Q Did you ever communicate the -- the dream that you had had to anyone else at the Union or in management?
A No.
Q All right. Now, do you remember about when it was that you had this meeting conversation with Bruce and Laura approximately?
A It was early February.
Q Of this year?
A Of 2023, yes.
Q All right. Now, let's go back and give us some background information. At the time of your removal, what was your position with the Agency?
A I was an equipment specialist or an ES for the Nuke Weapons Center under the branch, MSMR.
Q Is that the same as RS/RV?

A MSMR is a separate branch in the Reserve division, RS/RV, yes.
Q You were in that division.
A Yes.
Q All right. Now you've heard Ms. Masero and others talk about basically the nature of your job. Anything that you would disagree with there in terms of the -- what your job duties entailed?
A No, just that dealing with back orders, reviewing and updating and making sure that the instructions are clear and that anyone can read them and do the job correctly.
Q How long have you been serving as an equipment specialist?
A I started June 23rd, I think, of 2018 in that division in that area.
Q And at the time of the removal, about how many years of total federal service did you have?
A I had just over 13 years.
Q And prior to 20- -- excuse me, 2022 had you had any discipline?
A No. I have had no disciplinary actions, no suspensions, nothing against my record. It has been 100 percent clean.
Q And prior to 2022, had you have received annual performance evaluations?
A Yes. Almost every year, I received money and compensation awards or time off awards.

Deleted: 158¶

Deleted: 159¶

Q And -- well, how are your -- how's your performance rated? What's the scale?
A It's 0, 1 -- no. 0, 3 and 5.
Q What's a 3?
A 3 is satis or -- full successful.
Q And in your past performance evaluations, have you've ever been rated below a 3?
A No, I have not.
Q Okay. Now, work with us through what happened in 2022 with respect to the legal. We'll go through this chronologically. It sounds like in early 2022, you were having some discussion about a projected leave calendar for the year?
A Yes. We do that every year. We've done it every year since I've been up on base. And what we do is we fill out what we're projecting through the year of what time we're going to take off for annual leave. Now, for --
Q And -- sorry.
A Or if there's any -- yeah, just for projected any annual or leave that you have built up or accrued.
Q So presumably, they'll project out what your sick leave is going to be, but you don't know when you're going to be sick.
A Exactly. Yeah, you can't project sick leave.
Q Now, in early 2022, were you aware that your wife is pregnant?
A Yes, I was.

Deleted: 160

Q And do you have some sense of when the baby was expecting to be born?
A Yeah, we heard from her gynecologist that she was going to be due right around July 8th, '21. Sorry, 2020, yes.
Q All right. So in projecting out your leaves for the year, did you put anything down as far as PPL, paid parental leave? There we go.
A Yes. So on top of my annual leave that I normally request -- that I wrote down and requested, I actually contemplated should I write down my PPL on this, even if it's not really necessary to put it on a projected leave calendar. But in my eyes, it was saying I'm going to be generous, and hey, I'll let you know that at the beginning of the year that I'm planning on taking off three months straight, because me and my wife were having a baby. So I ended up writing three months continuous on my projected leave calendar above PPL.
Q Which covered approximately what period of time?
A July 8th through September 24, I think -- 3rd, something like that.
Q All right. And then you had some annual leave that projected for what period of time?
A So October -- I'm an avid hunter. I save up -- I don't really take any leave throughout the entire year, and I save all my leave for the last three months of the year, October, November, and December, because I hunt so much. I love it.

Deleted: 161¶

It's just being outdoors, so those are -- I schedule most of my time for the month of October. And then the holidays in November and December, I always take off also. So that's where I scheduled my (audio interference).
Q All right. So did you present this projected leave calendar with the PPL and the annual leave to the -- I just may call her Lori, but Ms. Masero, your supervisor?
A Yes, I did. And she asked us to fill it out to the best of our knowledge -- to the best of our knowledge, and I filled mine out, gave it back to her at the beginning of January or something in that time frame.
Q All right. And is there an issue with what you were requesting in terms of leave?
A Yes. She did not agree with my leave. She stated that it's unfair to my coworkers, that I'll be gone for such a long duration and come back for four days and then be gone for the majority of October.
Q Did you agree with that assessment that -- that arrangement being unfair to your coworkers?
A No, I didn't see it unfair, because it's a federal right to take FMLA for your child and everything else since 2020, which I was granted for my first son. So with my second son, I didn't get as much time as I wanted with my first son right off the bat, and that why I was so strong on things. So strong-headed, I guess you could say, of taking three months off,

especially with my wife. She also spoke very highly that she wanted me home to help out and get adjusted.

Deleted: 162¶

Q So did you have any concern that following your three months of paid parental leave you'd be off for another two or three weeks in October, and that would create a hardship for your coworkers?

A No, I wasn't thinking that way, because I knew that -- I think his name was Kevin. He was the lead that I was training, and then there was another --

Q Was he going to be a lead ES in your absence?

A Yes. He was a lead ES, and then he ended up leaving, and then Joe Webb ended up stepping into that position of the lead ES, and he has nine years of experience as an ES before, so I had no issues thinking that they were going to have any problems at all.

Q With you being gone that long.

A Yes, with me being --

Q So what happened? Did you -- did Ms. Masero ending up approving that to -- leave arrangement that you initially had proposed?

A No. She didn't approve that and everything at all. She told me, she says, you know, TJ, I can't allow you to do this, because you'll come back for four days from September, which would be September 26 through the 29th, and you wouldn't be able to get your system access back. You wouldn't be able to

Deleted: 163¶

submit any 2875s or anything like that, and then you'll be gone for the next, you know, three weeks in October. So I said, okay, well, just put me on leave -- on an annual leave for the 26th through the 29th of September. And she says, no, that doesn't help out at all. That actually makes it worse.

Q And your suggestion was going to be I won't even come back. I'll be on leave through the rest of September and then on annual leave in October.

A Yes.

Q All right. Did that suggestion fly?

A She says absolutely not. That was -- that's going to be even worse situation for your coworkers.

Q Before I ask further about that, the concerns that Ms. Masero had that if you came back for four days, you'll never get back into the system, you have -- this -- that you wouldn't be able to during those four days. Do you agree with that assessment?

A Yes, I did agree that it kind of seemed like a waste of time to come in for four days. That's why I suggested taking that additional four days off.

Q All right. And that didn't fly.

A No.

Q So what happened next?

A So she told me, she says -- I tried to talk through the time off and everything else, and she says, I just can't allow

Deleted: 164¶

you to have that much time off consecutively. So I said, what do you want me to do? She says, well, you can either move your annual leave in October, or you can come back for a few weeks instead of taking your full months of -- your full three months of PPL.

Q So what did you decide to do?

A So in frustration, I went back to my desk, and I ended up scribbling off three weeks of my paid parental leave and came back in and not very happily kind of says, here's my paper -- or here's my projected leave calendar.

Q All right. Did that projected leave calendar get accepted?

A That one did. So I -- she did also state that I can't have -- if you take three months off continuously, I won't be able to approve your annual leave in October. She didn't say why, and then later on down the line, everything else is that reason to be (audio interference).

Q Was there an agreement breach in terms of, okay, this is the way it's going to be?

A Yeah. She -- her and I agreed that I would return on September 6th, granted if there was no issue with my family and that everything was okay with my kids. And I even have an email stating that that I'll try stay with the leave as closely as possible, depending on my family situation.

Q All right. You worked through June 29th, I think you

said.

A Yes.

Q No issues regarding leave?

A No.

Q And when the baby was born, June 29 --

A Yes.

Q -- leading up to the just immediately before the birth of your baby, did any issues arise regarding leave?

A Actually, yes. Things were leading up to -- up until literally minutes before my wife actually delivered our second child. Lori was demanding that I get my PPL paperwork completely filled out and sent to her, or else I wouldn't be on PPL. So I ended up bringing my laptop into the emergency room after I got off work after 11:00. Me and my wife rushed in, ended up going into labor, and I was sitting there on the couch with my wife in labor trying to get these documents filled out, instead of being with my wife during this time. I filled out a document.

It was what I projected to be -- it asks do you want to take PPL continuously or intermittently. If intermittently, it states, give a reason. So in that reason I put intermittently, and I stated, as Lori said, that I wanted to -- I originally requested to take 480 hours off, but my supervisor, Lori Masero has given me an ultimatum that if I take off three months continuously, she will -- she's holding my annual leave pretty

Deleted: 165¶

much hostage that I won't be able to use it in October. And that's where Lori came back and said --

Q I take it you submitted that paper --

A Yes.

Q -- to Lori.

A I did submit that to Lori through email, and she completely denied it. Says no, I'm not approving this. You need to put a valid reason. And that was the most honest and valid reason that I could see it. So I, then, was just done with it, and I said -- I wrote another one that same day that says support -- to support my team, I think, is what I said. And I just sent it to her just to get it out to her.

And then there was some names in the wrong places that I needed to correct from what me and my wife filled the paperwork out as and my wife was going into labor. She got very upset with me and said, are you are you going to get off your f'ing computer and come be with me at this time? Right then, I closed the laptop, and I just put it away. I texted Lori, and I says, put me on sick leave. My wife's having a baby.

She texted me back and said, if your wife's having a baby, you need to be on PPL. And I said, I don't care. I'm not getting paperwork filled out. Put me on sick leave. That's where, I think, there's -- if you want me to fill out this paperwork, you're making me miss this time with my wife. So it put a extremely strenuous -- sit me in a strenuous situation

Deleted: 166

Deleted: 167¶

with my wife, with our newborn, completely robbing me from that amazing miracle that happens at childbirth and everything else.

Q Were you upset about that?

A Oh, absolutely. I was extremely frustrated, angry at her, and it ended up bringing resentment into my home with my newborn son that it was to a point that I felt like I wasn't in the state of mind and that I was neglecting him and my wife and my oldest son.

Q You have two children. This was your second child?

A Yes.

Q All right. You go on. Did you begin your parental paid leave on the 8th of July or the end of June?

A On the 8th of July, because I told Lori just put me on sick leave until my paid parental leave paperwork stated July 8th. So she agreed with that.

Q All right. So you were on paid parental leave through the rest of July, August, and into September?

A Yeah.

Q Now, earlier in -- earlier in the year, you talked about a projected return to work date of September 6th.

A Yes.

Q Did that happen?

A Actually, no, because --

Q Why not?

A In the midst of July, I think, it was -- me and my wife were talking about me staying home for the three months and that it's not fair that I had to choose, or that I had to have an ultimatum to go back to work when my wife needed me, because her postpartum was very, very extreme in my eyes from what I -- how I know my wife.

Q You mean her postpartum depression?

A Sorry. Yes, her postpartum depression. So it was very extreme that I needed to be home, and I needed to take care of her.

Q So you'd had this agreement earlier in the year about coming to work back on your September 6th, you know, not using the last three weeks of your paid parental leave. Did that change then?

A Yes, it did. My family ended up getting COVID the early start of September or I think it was the early start of September where my son and my wife ended up getting a sinus infection that turned into bronchitis. That was my newborn son had gotten that. So we were extremely, you know, nervous about it. We ended up -- me and my son, oldest son ended up contracting it. We had to take him to the hospital for breathing treatments through the emergency room and everything else.

So it -- the sickness passed through the 1st of September up until it was literally three weeks once all of us were over

Deleted: 168¶

it. So I requested sick leave instead of PPL, because we were all sick.

Deleted: 169¶

Q And was that granted?

A Some of it was, and some of it wasn't. We ended up hashing it out in the union meeting, the grievance step 1 on September 26.

Q All right. Let's talk about that meeting, and then we'll talk about the situation with September 27th, 28th, and 29th.

A Yes.

Q So you have a meeting on the 26th in September.

A Yes.

Q And who is involved with that meeting?

A That was me; union representative, Bruce Johnson; there was Lori Masero. There was -- I think it was Ashley Zorko. There was one other lady that was one involved.

Q So Ms. Masero was there in the meeting?

A Yes, she was.

Q Does the supervisor, if you know, normally attend those meetings?

A I wasn't sure if she was or wasn't going to be there. As she stated on her testimony that she said first lines usually don't show up to those. But she showed up to this meeting.

Q All right. So what did you discuss in that meeting?

A So in that meeting, it was for two different grievances. One was denial of leave and then the second one was the

arbitrary denial of leave for October. We discussed that and then also the sick leave that was earlier that month through my doctor's notes and my self-certified doctor's notes, the doctor's note that I provided Lori, because she said that she was going to deny me a portion of that sick leave, even though I requested it off or provided medical documentation to her that she needs.

Q What -- was anything resolved in that meeting?

A Yes. So in that meeting, Lori was very -- her body language was very flustered and frustrated, to the point that she was raising her hair up into a ponytail, because she wasn't -- she wasn't getting her way.

Q What -- let me interrupt you there for just a minute. And you were acquainted with Lori for -- you've worked together for several years?

A Yes. Since '18 when she became a supervisor.

Q All right. And I mean how would you describe your relationship with her, generally, before she became the supervisor?

A It was -- it seemed just like a normal relationship. She knew that I worked on vehicles. I worked on diesels and everything else for fun and as a hobby, and she asked me if I could take a look at her son's car. And sure enough, after work I went to her son's apartment to look at it to see if I could help her fix it and everything else, just being a good

Deleted: 170¶

Deleted: 171¶

coworker. So I mean, I felt like I was -- like our relationship was fine. She was -- she asked me for help. I'm willing to help her, and there was nothing wrong.

Q Fast forward down to the September 26th, I believe it was 2022 in the meeting, so I was asking you what got resolved. Did anything get resolved in that meeting?

A Yes. So in that meeting, she was forced to approve my projected leave for what was on my calendar for my annual leave for -- since September 26th to December 31st. She had to accept that, and she was also directed by LR that she needs to approve all of my sick leave in September, because a self-certified doctor's note from yourself is suffice (sic) documentation for sick. So part of the sick leave was by medical professionals, that we went to the hospital that we went to get treatments for my kids. And then the other few days was for my own personal that, hey, I don't need to go to the doctor, because it's the same sickness that's gone through the first two or three of us.

Q During that meeting -- well, we'll talk about the next few days in a minute, but during that meeting, were there any concerns raised about the productivity of the office with you being gone?

A In the meeting, Lori even stated -- she, she says or I asked her, I was like, is my work -- or LR asked her.

Q When you say LR, who do you mean?

Deleted: 172¶

A The Labor Relations.
Q Right. Is it --
A I have to look up that whole thing.
Q Okay.
A I can't remember. It's more than that. I can't remember, but she asked Lori, you know, how is TJ's work going? And Lori's response was, well, it's getting done, but it's putting a burden on -- it's putting the burden or it's unfair to his coworkers that he's gone.
Q Okay. All right. And did you have any reason to disagree with that assessment of how your absence is affecting your coworkers?
A I disagreed with it. But she says that it was putting a burden on my coworkers because before -- she stated that there was two ES that got hired about a month before I took parental leave. I was handling all five workloads in that area of RS/RV by myself.
Q Before these two were hired.
A Before these two were hired. And on some days, yes, it is -- it was extremely busy and then others, it wasn't busy. I mean that I could actually go to the gym and kind of decompress and relax, take some stress out and everything else. So for her to say that it was putting a burden on them, I disagree with that wholeheartedly, because there was more ES in the office than just myself, and I was getting it done with just

myself.

Q All right. So let's talk about the September 27th, 28th, and 29th situation. What was -- what happened with respect to those three days?

A So in the union meeting in -- on the 26th -- I forgot to say that Mark Burrows was also in that meeting, too. I hadn't projected all of my annual leave, all of my use or lose annual leave for the year. And in the beginning of the year, she said, yeah, just use it when you need to or when you -- when something comes up. So the 26th -- or sorry 27th, 28th, and 29th of September of '22, I requested those days off in that meeting on the 26th. I said, since I don't have all my projected on my use or lose schedule, can I use some annual leave to go camping, go hunting early? And she said, or Mark Burrows said we're not discussing that right now. You can discuss that after hours.

So I said, okay. So I sent Lori an email and requested that leave. I says Lori, since I haven't used all my use or lose, can I request the 27th, 28th, and 29th of September off using my annual leave?

Q So you haven't been back to work yet?

A No.

Q Okay. Go ahead.

A And she responded and says -- said to me, since this is not on your projected leave calendar, I am denying your

Deleted: 173¶

request. But since you have -- since it's already scheduled for PPL, you can use that. There you can be on that leave. So therefore, or she said before you leave, make sure that you input your timecard and make sure there's no flags. So that's what I did. I put it as LN with DG as the subcode.

Deleted: 174¶

Q The paid parental leave.

A Yes. Paid parental leave.

Q All right. And where did you go on those three days?

A Me and my wife and kids and my dad and family and my brother, sister, all -- we all went up to the mountains to go camping. I didn't have a tag. I didn't have -- I didn't draw out on anything. My dad did, but I didn't. So we just figured we'd go up, and we'd go camping a few days before the elk hunt, which I do -- which I did have a tag for in 2022.

Q Well, those three days you didn't do any hunting?

A No.

Q You went camping.

A Yes.

Q And is there any restriction as far as you know when you are on paid parental leave about going camping?

A No, there's no that I can think of. And as an example, with my first son that I had, we -- me and my wife and extended family -- her ex -- her family ended up going to Mexico on paid parental leave with my son.

Q All right. So the -- you take those days, and do you go

Deleted: 175¶

on your hunting trips in October each year end leave?
A Yes. Yeah. So since she was directed by LR that she had to approve my leave in October, then yes, I used all of -- but I used some of my annual leave through October for my elk hunt.
Q All right. And did you come back to work after that period that you did check for annual leave usage in October?
A No, I had not.
Q Why not?
A Just because there was more stress and more every -- everything that management was doing to me. They were trying to make me work during my PPL. Every time that I was trying to log my time, they weren't approving it. Lori was denying my leave. She was denying my leave requests. I had medical procedures that were getting done. The stress, the anxiety, the depression, it was just building up with me and my family, because of everything that had kind of compiled itself, like a -- almost like a snowball effect that it started in the beginning of the year when she started denying the leave for my hunting trip. And then I had to fight for up until the day before I left to go camping and go hunting later on. And then it just kind of built up more and more.
Q How did that start affecting you?
A I was honestly losing sleep. It was very consuming. I couldn't think about anything else that was going on in my life. I was forgetting to do normal daily things with my

Deleted: 176¶

family.
Q How was it affecting your sleep?
A I was -- to this day, I'm still waking up three, four, five times a night thinking about everything that's going on; how I've been treated, how I've been mistreated, what had happened to me, how unfair it was since July. I tried to do everything that I could to -- in a state of mind, get a reasonable accommodation just to get out of that area, because of the treatment that I was responding to, that I was receiving from my management team.
Q We'll talk about the reasonable accommodation piece again in a sec. Was it affecting (audio interference) in other ways?
A Yeah. So I started developing a sense of paranoia that if I'm in a crowded area or anything like that, like I'm constantly looking over my shoulder, looking for people, like just watching them to make sure no one's out to get me. I started iso -- or I started isolating myself around my own family. Just I have a detached shop in my backyard, and I do my hobby of just repairing diesels and everything else, and I would literally wake up, sometimes say good morning to my wife and my kids and others. I just walked out back and just isolate myself. And I'm just trying to keep my mind off of everything that was going on with Lori and Thomas and the HR specialist.
Q Did you --

A With my friends, I stopped hanging out with them. It was -- it just -- I kind of stepped out of my own life, because I'm a -- you can ask any of my friends. I'm an outgoing individual. I talk to people. I -- and I always want to hang out with friends and family and everything else. And I just quit doing that. I --

Q Did you seek any professional help for what was going on?

A Yes. I tried to get on to the DAG program, the Employee Assistance program. I called them multiple times, left them voicemails. Then I received a call back from them that said that they would try and find me a counselor or a psychiatrist to speak with to start some sessions, but they were pretty booked out. I said, okay, well get one as soon as you possibly can. They weren't finding anything. I ended up resorting to my bishop. I spoke to him about the situation and everything.

Q So your bishop, your religious leader?

A Yeah. Yeah. My religious leader. My bishop. I talked to him about the whole situation, what had started and filed, and then what's still ongoing about it. And he wanted to see me once or twice more after that, and then he wanted my wife to come in with me also to talk to him about it and see how we are doing as a couple. And if we needed couples therapy or anything like that, then we will schedule it through the church branches and everything else. But he referred me to a counselor through our religious entities and everything.

Deleted: 177¶

Deleted: 178¶

So I ended up going to a religious counselor. And as I was speaking to her, I just vocalized everything that was going on. I talked to her about my dream. She asked me was there any way that you would act on that, because she was in fear of me doing something, and I said there's no desire, there's no nothing. She asked me why not? And I ended up telling her that I love my family too much, and then if I did something stupid like that to get rid of one person, then it would ruin my life, and I'd never be able to see my family. And then --

Q Did you seek out any treatment with a medical doctor or psychiatrist, psychologist?

A Yeah. So I've been seeing P.A. Drescher for my entire life since I was a little kid, so he knows my health history better than anybody does. So that's why I know most comfortable will just go to him and talk to him about what was going on. I explained to him the whole situation also, and he told me that -- he was the one that referred me to the program VA program very -- first to get on to counseling and then also to speak with my bishop. And he ended up prescribing me some antidepressants and anxiety medication to help with all the symptoms that were going on with -- I was -- I had a lot of chest and pain, like someone was sitting on my chest. I had headaches. I felt very nauseous, lightheaded, dizziness throughout this time. I think I explained that to him and everything else. And he prescribed me some medication at

first, and then it just progressively got worse and worse, because it was almost like when management didn't believe me about what was going on.

Q Did you make any effort to try and come back to work (audio interference) in November and December?

A I planned on it. I talked to a coworker when I went in. I was filing more grievances in the denial of leave. They making me do -- perform work on PPL time. And my coworker asked me when I was going to return, and I said well, I have use or lose that I have to burn, so it'll probably be the first of the year. And he says, oh, okay. Is everything okay? I said, it's just going. Not up, not down. It's just kind of a flat line.

Q So you were getting emails or requests from Ms. Masero about when are you going to come back to work during this, weren't you?

A No, I wasn't -- wasn't getting emails about it. It was when I went in to -- in that same exact instance that I went and filed those two grievances, I talked to my coworker. That's -- I had a meeting with her that I -- with her and Thomas, and they both told me --

Q With Lori and Thomas Huber?

A Yes. Thomas Huber. So Lori pulled me into Thomas' office and that's when they first wanted to discuss a return to work date with me.

Deleted: 179¶

Q All right. Let's try and bracket that timewise. You have your meeting with the Union and the LR in June --
A Yes.
Q -- and September 26th.
A Yep.
Q Is this a later meeting?
A Yes, this is a later meeting.
Q You remember when -- about when it was the meeting?
A Probably -- I think in November-ish.
Q Okay.
A Yeah. I think it was November/December of '22. I went and filed two more grievances. I might have to look up my grievances and everything, but filed two more grievances, and Lori called me into Thomas' office, and I handed them the grievances and just asked them if they could fill it out and turn it in to LR, and they said yeah. And I said, okay. Turned around and started walking out of their office, and Thomas says, hey, TJ. Hold on a second. I then -- based off of our first conversation with me filing two grievances, I pulled out my Weingarten rights.
Q What do you mean by that?
A It's my union rights, that I have to have a union representative present in order for them to speak to me about this situation or an uncomfortable situation. A union representative has to be present in order for them to talk to

Deleted: 180¶

me.

Q I know. When you say you pulled out your Weingarten rights, it's a card you're referring to?

A Yeah. I have the card in my wallet. I pulled it out. I knew what they were going to do to me. They entrapped me in the last conversation, which that's what actually gave me a -- that's where they gave me a verbal reprimand. So I knew they were going to do this again, so I pulled out my Weingarten rights, and Thomas and Lori spoke for about two minutes and then looked at me and said, hey, TJ, we need to sit down and talk about when you're going to return to work. And I held up my Weingarten rights, and I says, I don't feel comfortable speaking with you guys about this situation without my union representative. So when you get a hold of them, we can schedule a meeting, and then I can come in, and we can talk about it. And I said, so have a nice day and turned around and started walking out.

And that's when I felt threatened by Thomas, because Thomas raised his voice and said, you can't do that. And I stopped, and I hesitated for a minute or for a couple of seconds, and I was like, I'm not going to go through this again. I'm just going to walk out. And he yelled, TJ, stop. Get back here. And I told him or I didn't say anything. I just kept walking.

And then Lori ended up coming down all after me and said,

Deleted: 181¶

Deleted: 182¶

TJ? I turned around, and I said, yes? And she said -- she said something to me. I can't remember exactly what it was, and then I turned around or I spoke to her and I says, and by the way, Lori, I'm taking my three months of PPL off continuously. That was the day that I said that.

And then I ended up walking out, and I didn't get stopped by him. But it's just -- I -- I've been --

Q Did you have any sort of follow-up meeting with union and yourself and management?

A He did it himself in management. Not for quite a while actually. So I don't know exactly when it was, but yes, we did have a -- that might have been -- yeah, it was -- I think it was December when we had that meeting of when I was going to return to work and to figure things out. Lori and Thomas finally got a date scheduled that we all could meet in the office.

Q Did you end up returning to work?

A No, because in that --

Q And why not?

A In that in that meeting, I still -- I was still having so much anxiety built up, I think at that time, that's when I switched to Dr. Ybaben that I initiated the workers' comp claim, because I just felt that I couldn't return back to work with management because of how they treated me, how they allowed HR to treat me.

Deleted: 183¶

Q Did you ever make a request for a reasonable accommodation?
A Yes, I did multiple times.
Q Can you pin down a date on the first one?
A I think it was -- is -- that the other spoke, I think was in February time frame. And --
Q It -- was that an actual document he filled out?
A Yes. Yes. It was filled out a document. Ended up submitting it Lori. And I --
Q Let me ask you some questions about that. What were the accommodations you were requesting?
A I was requesting -- the first one was I think it was to -- for a reassignment.
Q Okay.
A Just to get me under a different supervisor. I do examples of my work background to help them to see if they can find me a different position that was open or becoming available or anything like that. Also there was the full-time telework that I didn't have to physically see Lori and Thomas. You know, I can email through the email chain and do my work that way or just work a different hourly schedule than those individuals that's causing my anxiety and depression.
Q So the telework, would that be feasible given your need? I mean you had to have a security clearance in your job, right?
A Yeah. For that job, yes, I did.

Deleted: 184¶

Q Was it feasible to perform your job as an ES, equipment specialist, by teleworking?
A Yes. During the pandemic -- the COVID pandemic when we started teleworking in 2019 (sic), I was under a different supervisor. His name was Tim -- Timothy Green.
Q Hold on. So you -- I think the pandemic is considered to have first started in early 2020. Was there a teleworking before then, or are you talking about onward in conjunction or because of the pandemic teleworking was part of the pandemic?
A So like we were forced to go to our homes, because they didn't want groups of people being together with COVID being spread like it was.
Q Okay. So did you end up going home?
A Yes. I went home for almost two years. And I -- I'm almost positive that during the first year of COVID that I didn't even return to work for one day during the entire pandemic. And then the second year --
Q Were you able to do your job?
A Yes. I did my job fully 100 percent. Worked with my teams, worked with my engineers, made the corrections to the technical orders, worked with the field units, also with the global strike to make the corrections needed for the warfighter and for the Anaplan entry system.
Q That was the word I -- warfighter?
A Warfighter.

Deleted: 185¶

Q What is that?

A That's the people that are actually out on the field, like the troops that -- well, any other military personnel that are out there.

Q So during COVID, you're working from home, you're directly doing your job. Didn't you have to go into any shops during that time?

A Not during the first year. The second year, that's when they started bringing us back, as needed. So if we needed -- if the shop needed some technical procedures corrected or changed, that's when they requested us for however many days as needed. But we still kept our distance, go down the technical orders how they seemed fit on what their -- what procedure they need to achieve. And then that's when I ended up taking those procedures back in my house and implementing them into the system and making the changes.

Q I guess you had some sort of security protocols in place when you looked at all the classified information?

A I never work with any classified information. I -- in my time of being an ES, four and a half years, there was not one classified document that I ever recall making a change to.

Q Okay. So what got us down that road was you had made some requests for accommodation, at least the ones you were just talking about, you've actually submitted the paperwork. Had you made informal requests for accommodation before that?

Deleted: 186¶

A In that June 26th meeting, Lori actually -- sorry, September 26th -- September 26th meeting. I don't know why I keep saying the June, but September 26th meeting with Lori and the Union, she actually spoke to -- spoke out and says we're actually looking in the direction of a reassignment. And I spoke up and said I would absolutely love that.
Q Meaning a reassignment of you?
A Yes.
Q Okay. Did anything come of that?
A No. Nothing was ever said afterwards.
Q Okay. Fast forward to when you're making -- make this formal or written request for accommodation. What happens again?
A I submitted it to Lori, is what I remember. And she ended up turning it in, and then it got kicked back, because it was the incorrect form or it wasn't up to date or something like that. It wasn't the correct date number or something that made something -- something that changed on the form to make it that it wasn't a valid form.
So she then had me submit a second one, fill out the new form and then submit it to her. I submitted this right before the deadline, because she extended it 20 days, because she sent the wrong form to us the first time. She said I'll extend it for 20 days, because of the mistake. So filled out the form. Had it sitting there, and I've been waiting to get it in to my

health providers to get all of my medical background to submit with the reasonable accommodation.

Q That was a requirement.

A Yes, that was a requirement. So I knew the day was going to come up or that I was going to be within one or two days of being late. So I requested to Lori, I says, hey, Lori, is there any way that you'll extend this for a couple more days while I gather this information? And she said, TJ, I'm not extending this. So when you get the required information, submit it again. So it was --

Q Did you get the required information?

A Yes. So I got all of my medical history all the way back for as long as I can remember or, sorry. I think it was since August the 1st of the 2021 or 2022. I requested that information up until the current date. So they ended up sending that to me in a secured folder. So I admitted, put that together, changed the dates on the reasonable accommodation, and then I forwarded that information in to Lori.

Q Did you submit it to Dr. Ybaben?

A No. I wasn't told to send it to him. I was -- Lori came back and said that you need to send it in to Lindsay Strickland. And I then forwarded the information to Lindsay Strickland.

Q Let me make sure I'm understanding it. So you first

Deleted: 187

submitted the medical information to Lori Masero.

A Yes.

Q She then tells you to submit it to -- forward it to Lindsay Strickland.

A Yes.

Q And did you do that?

A Yes.

Q All right. And who's Lindsay Strickland?

A I am not sure exactly what position she holds. That's just the individual that already specifically stated on her email for the medical information to send to her attention.

Q Al right. What became of your request?

A I haven't heard another word.

Q Were you told that your submission of the medical information was inadequate --

A No.

Q -- or that your medical provider needed to provide information about how your dis -- how your impairment was substantially limiting the nature of life activities?

A No.

Q Or work restrictions?

A No.

Q Well, then did you ever receive any kind of accommodation?

A No, I did not.

Q All right. Now, I guess somewhere in this fact pattern we

Deleted: 188¶

have a conversation that, you know, seems to talk about an agreement.

A Yes.

Q And then were you still planning on coming back to work?

A When I had that agreement, and I went into the union office, I knew that I wasn't in the right state of mind to return to work. I vocalized that to Laura and to Bruce Johnson that same day that -- this is one of the reasons why I can't come back to work is because of my mental stability and everything else. So what was going on in my life caused by the management and the stress and everything that had built up that they were causing.

Q All right. And then you gave them a notice, indefinite suspension -- I'm sorry. Well, indefinite suspension because of the more -- your security clearance had been suspended? Let me back up, did you get notice that your security clearance had been suspended?

A I'm pretty sure that I did, yes.

Q All right. And you were also getting some discipline about the same time, correct?

A Yes, I was.

Q Did you challenge that discipline?

A Yes. I submitted grievances against management for my medical documentation that I provided them and just for, you know, again, the reason that they were denying me for no

Deleted: 189¶

reason.
Q Did you challenge the proposed suspension of your security clearance?
A That was definitely a suspension.
Q Well, the next -- the actual.
JUDGE BROOKS: I'll need to --
THE WITNESS: Oh, sorry. Yes, I -- I'm pretty sure that I did challenge the decision.
BY MR. HOLDSWORTH:
Q All right. Then you get a notice of proposed indefinite suspension, because of the suspension of your security clearance, right?
A Yes.
Q Did you challenge that?
A Yes.
Q Then you got the barment order.
A Yes.
Q How did you find out about the barment order?
A I was -- I wrote an email to Thomas Huber letting him know that I was going to be on base tomorrow, and I was going to ask him if he could approve regular leave for I think it was for going to see the Union about some of my issues, and I then received a phone call from a base member. If I remember right, it was a 775 number. Received a call, and it's -- the gentleman who answered, his name is Harry -- Harry something.

Deleted: 190¶

Deleted: 191¶

He introduced himself and everything else and spoke to me about what was going on and then there -- that there had been a barment letter issue against me for some of the things that I had said. And I didn't understand it. I asked the gentleman to hold on for a minute. I ended up doing a three-way call with my mom, because I didn't feel comfortable responding to any other questions, and I can know if I need an attorney present at the time. So then they started -- they continued speaking about what had happened that I had been barred from Hill Air Force Base and that if I returned in any way, shape or form, that I would -- I could face a fine and up to a certain time of imprisonment.

Q It would be --

A Yes, it would become.

Q So after the -- disclosing the dream you had or, you know, to Ms. Haislip and Bruce Johnson, have you had -- made any threats to Lori Masero?

A No.

Q Of any kind?

A No.

Q Or to Thomas Hubey?

A No.

Q Or Aimee Tarbet?

A No.

Q Or any -- anybody as far as this case?

Deleted: 192¶

A No. I ae never made threats towards anyone as far as this case.
Q Were you ever required or requested to undergo any kind of a psychological evaluation prior to receiving the -- either the suspension of your security clearance or the bar?
A No, I was not.
Q Or to attend a psychological fitness review?
A No.
Q Or anything like that?
A Lori Masero sent me an email asking me -- when I -- she told me, she said before you return to work, you have to be cleared by Dr. Ybaben. And I didn't understand that, so I just responded and said I didn't need to be seen by anybody except for the provider, which was Dr. Dixon and Dr. Taylor.
Q All right. Did you pursue a -- going back to work --
A Right.
Q -- to get a clearance?
A Not -- no. I did not. I was more worried about my mental health and trying to get my psycho -- psychological evaluation done by Dr. Taylor, get approved by the workers' comp, but it was denied. And Dr. Taylor spoke of self-pay. It was -- it just was out of the question, because of the amount of money that it was going to take that I had to pay out of my own pocket to get that evaluation done. I just didn't see it there to get that evaluation, right, because of -- I -- it would be

out of my own pocket. And it wasn't my fault of what's -- transmission.

Q All right. So when -- so you get -- you eventually are notified of the barment order, I take it.

A Yes.

Q Did you have any say, any opportunity to respond to anybody who was involved issuing that barment order before it was issued?

A No, I was not.

Q Were you ever asked by anyone before the issuance of the farming order about any alternatives to being just completely barred from working on the base --

A No, I was not.

Q -- such as working from home?

A No.

Q And going back to the security clearance, had your security clearance been revoked or (audio interference) or taken away?

A At this time, I think that it's been suspended, from what I remember. But I said -- I think that it was revoked.

Q Well, okay. The -- has there been a final decision as far as you know by the Agency which adjudicates security clearances?

A No, there has not. That was in the meeting that I had a phone call with Harry, Thomas Huber, and a couple other ladies

Deleted: 193¶

Deleted: 194¶

that they notified me of the barment. They said that they were going to do a security -- a third-party security clearance investigation that was going to take place to see how -- to see if I was going to be eligible to keep my security clearance or have it revoked. So I actually never have had a response to that -- that investigation. They just pulled my security clearance based off of the dream that I had.

Q Do you know whether there's even been an investigation into your security clearance?

A No, I have no idea if they have even started anything.

Q Okay, now a few other questions. The allegations or the charges in the removal letter, there are three of them, as you know. Let's talk about each one. There's conduct unbecoming. I believe this was the dream. Well, can you control what you dream about?

A I can't. I don't know how I even can.

Q Was there any conduct that you engaged in that was unbecoming personal which called of the offense of unbecoming?

A I've always been a great civilian employee for Hill Air Force Base for the last 13 years. As I stated before, my record is clean and 100 percent pure, so.

Q It was until 2022.

A Until 2022, yes.

Q Inability to perform your job. I mean, you'd agree that or would you that is it impossible to perform your job

without -- with your security clearance being suspended.

Deleted: 195¶

A I can perform 95 percent of the job, maybe even more -- 96, 97 percent of my job without security.

Q Well, tell us about that. How can that be?

A So as I stated before, out of the four years that I -- four, four and a half years that I was an equipment specialist, I hadn't changed one classified document my entire career in RS/RV department. There were very few classified meetings that I was a part of. If you consider, there's almost different levels. So like as the equipment specialist, they ask you to make changes to the TOs, but you don't have to know the entire program like a program manager. So these program managers are the ones that go into classified meetings most of the time with engineers.

Engineers are the ones that have to know all the classified information. So I was at the bottom of the barrel. So 95 percent of the meetings that I went to when there wasn't very many, I didn't even need to be there. It was so over my head that it was useless information. But as Lori stated, there's classified numbers mostly that we need to know, and those are the meetings that I would go to just to hear numbers. I wouldn't make any changes to numbers or anything like that. That wasn't my job. My job was strictly those TOs.

Q So were there equipment specialist jobs on base where you did not need a security clearance?

Deleted: 196¶

A Yes, there are.
Q You couldn't have done those jobs, I guess, without knowing what the job was or learning to do it, but it was the same position?
A Yeah. Same position. Just kind of the same as when Joe came over. He was in the --
Q Joe Webb?
A Joe Webb. When Joe Webb came over, he was in supply chain, yes, so he was more over the little piece parts, as where I was ES over major in that which was the reentry vehicles. So as long as you know the system that you use, transitioning over to a different type of ES position is the support. Because you're doing the same exact work, making changes to technical orders.
Q What about the barment, could you do your job if you couldn't get on base? The job of equipment specialist in your area you worked in?
A In my area I could have performed, again, 95 to 97 percent of the job without being on base.
Q I think that that option was never resolved.
A No, it was not.
Q All right. The last charge, lack of candor, now, you've been -- that has been an aspect of higher discipline since 2022, the lack of candor? Well, for example, there've been the allegations that the side business. There were questions about

Deleted: 197¶

the --
A Yeah. Yes. There was allegations of the --
JUDGE BROOKS: I didn't hear the question. Can you repeat the question, Mr. Holdsworth?
MR. HOLDSWORTH: Sorry, Your Honor.
BY MR. HOLDSWORTH:
Q There had been -- and in an earlier discipline and accusation of lack of candor in the sense of not being truthful about your hobby of working on cars and trucks. Were you truthful about -- to that hobby?
A Yeah. Yeah. I was 100 percent truthful with that hobby to my coworkers, that it was just a hobby, that I did it after hours and that it was just for me and my buddy to make a little extra money on the side to help our families out.
Q All right. So was it a up and running side business?
A No. So me and my partner, my buddy that we've been doing this together for eight years now, we -- what we do is we buy vehicles, diesels across the country, you know, we buy them from Georgia to Washington to Michigan. All over the country. Have them delivered to my house, then me and my partner fix them up and then sell them. So it's -- we just do it as a hobby. We don't advertise anything. We don't tell anybody that, hey, bring your broken trucks to us, we'll fix them or anything like that. This was just a sole -- me and my partner bought trucks, brought them in, fixed them, and then resold and

Deleted: 198¶

made a little bit of money on them.
Q That's what you're doing in your spare time.
A Yeah, just in my spare time and after hours, sometimes weekends and holidays.
Q All right. And the lack of candor regarding or usage of leave. Is that truthful about what you were trying to use in terms of leave?
A Yes, absolutely. I had medical documentation from providers. I had documentation for my counselors for my kids' doctors' appointments. I just didn't see that -- I did block out the personal information that I heard Lori say that she had to ask multiple times for, because she said that if it was for my youngest kid, it would be PPL leave. If it was for my oldest son, it would be even for -- I could be sick, when, in fact, reading the regulation, there is no determining factor on that. You can use your sick leave for your family members and that's what I see fit. And --
Q There was also, in a prior discipline, an accusation that you had misled the Agency by taking for bereavement leave for a family member when it was actually a dog or dogs. Tell us about that.
A So me and my wife have our own dogs and everything and we've grown up -- grown with them. They go everywhere with us. They're like our kids. Everywhere we go, we go to the ice cream store together. We take them shopping with us. We take

them on our hunting activities or our boating activities. Like, we do everything for them. So we consider them as family, some closer than some of our family, to be honest. But it's just when we lost a couple of our dogs, it was just devastating. My wife --

Q When they died.

A When they passed.

Q You said lost.

A Yeah. When we lost the -- we lost two of them. We lost one day, and then we lost another one the next day, and my wife was beside herself. She'd been crying all day. And you know, I didn't know what to do. I was just trying to be there for and help her through it, trying to be the stronghold of the family, I guess you can say, and then the second month passed, and it wrecked her even more. And it hurt me just as well, and it was just, you know, I -- we needed time to grieve with our -- with each other and with our kids and everything else through this process and what I felt.

So I requested leave -- bereavement leave for the passing of our, I consider, family members, our pets. And Lori accepted it at first, and then she said okay. And then she requested that I send her some documentation, an obituary or a death certificate or something else. And I was like, you got to be kidding me. Like, I was just in awe that, you know, it doesn't matter if it's a human or if it's a pet, in my opinion,

Deleted: 199¶

Deleted: 200¶

if you have a loss in your family that's significant like that, it doesn't matter.

Q So did you tell her what the -- about the dogs?

A Yes. So she asked for the -- I sent her the information on, I think it was the 15th of February, and then I just got on the computer, sent her the email.

Q This is 2023?

A 2023. Send her the email. And then I just walked away to be with my wife and just was with her. And then the next day, we lost our second one, and then I went to him to write Lori another email. It was the 16th. And she requested for the death certificates or obituaries. So of the people who -- she assumed it was people who passed. So I, then, responded these were my canine companions -- mine and my wife's canine companions, and so there is no documentation pretty much. And she says -- she accused me of saying you -- you worded it to make it sound like it was a human, so, therefore, I'm pulling back my acceptance of your leave for yesterday and deny, and you're put on a AWOL for yesterday and today, so.

Q Did you ever meet with the -- with respect to the proposed removal challenge, did you meet with her?

A Yes. Yes. We did have a follow-up response. Yes.

Q Did you ever have an in-person meeting or oral reply with Ms. Tarbet?

A No, I did not.

JUDGE BROOKS: I didn't hear that question and answer.

MR. HOLDSWORTH: Oh, I'm sorry. I asked if he'd ever had an oral reply or in-person meeting with Ms. Tarbet about the proposed removal.

THE WITNESS: And I said no, I never received or I never had a meeting with Aimee.

BY MR. HOLDSWORTH:

Q By that time, you were already barred from the base, right?

A Yes.

Q And you couldn't have got on the base?

A No. The union -- or sorry. It wasn't. It was the union and LR were actually trying to get me on base to deal with the grievances that I had filed. And I wrote on an email stating that I'm not going to perform an illegal action of entering Hill Air Force Base and committing a crime essentially, because that's what the barment letter stated. They were pushing to get to these grievances closed, and they were trying to force me onto base to do something illegal, essentially.

Q Did you do anything to violate the bargain order?

A No.

Q All right, then.

MR. HOLDSWORTH: Okay. Those are all the questions I have, Your Honor. Thank you.

Deleted: 201

JUDGE BROOKS: Thank you. I'll turn it over to Mr. Smith.

MR. SMITH: Thank you, Judge.

CROSS-EXAMINATION

BY MR. SMITH:

Q Mr. Zuech, my name's Dustin Smith. Just a few questions, if I may, please?

A Of course.

Q In February 2023, you had a meeting in Bruce Johnson's office. And as I understand it, you were sharing with him and/or Laura Haislip some of your frustrations with work. Is that right?

A Yes, I was.

Q Were you explaining to them reasons why you didn't want to be at work?

A I was responding to them the reasons why I didn't feel that I could jump into work. Like if that -- that it wasn't safe for me to come in to work with the things that I had -- that were on my mind that just -- I dreamed about the night before.

Q And in fact, you recounted a vivid dream about -- and I want to make sure I get the right verb here, killing your supervisor or shooting your supervisor.

A I said shooting my supervisor. I -- there was never me saying anything about doing. It didn't -- I mean, I still --

Deleted: 202¶

Deleted: 203¶

Q Did you put --
A I still have the dream in my mind, because I don't know if you remember dreams that you have, but that one is burned into me that I know exactly what happened then. It's -- I don't know the end result. So I know that I didn't say killing. It was shooting.
Q Did you have a need or did you offer a clarification about what you said regarding your supervisor at some point?
A What do you mean by that? Sorry.
Q Well, it's my understanding that Laura said a vivid dream about killing the supervisor, and then did you have to clarify that at some point or have you always maintained it was shooting?
A I've always maintained it with shooting. I did have to clarify in one of the documents, I think it was indefinite suspension order. One of the ones that I think Aimee Tarbet sent. It might have been the barment that said killing that I had to respond. And that's where I clarified that it was -- I had a vivid dream about shooting my supervisor.
Q Okay. Thanks. And you were barred from Hill Air Force Base in March of 2023 Is that right?
A Yeah. I think March 16th, 2023.
Q And you had your security clearance suspended some time in that same time frame; is that right?
A Yes. Per my knowledge, yes.

Q Your timecard for September 27th, 28th, 29th of the year 2022, indicates that you were on paid parental leave those three days. Is that right?

A I don't have the timecard in front of me, but that's based on the email that I sent Lori on the 26th of September how she did -- she denied my annual leave and said that I was already scheduled for PPL, I'm going to agree with that, yes. But I don't have the timecard to verify that.

Q Oh. Well, let's take a look. On page 166 of tab 14 that's the beginning of your timecards. If you scroll down to page, I believe it's 170 -- page 170 of the time history --

A Okay.

Q -- if you see that.

MR. HOLDSWORTH: We --

THE WITNESS: That was one section that we don't have.

MR. HOLDSWORTH: Yeah. I wonder if you could share your screen on that, or?

JUDGE BROOKS: I could enable that. Before we do that though, it's part of the 260-page Agency file. Are you sure you don't have that, Mr. Holsworth? You have 14?

MR. HOLDSWORTH: I do have, and I can access it. I just didn't -- what I'm looking at is what I printed off, and I have some reason printed off that three pages. So I could look at it on the computer, but I have to get closer to that other

Deleted: 204¶

Deleted: 205¶

computer, so if it's convenient to share the screen, that might be the fastest.

JUDGE BROOKS: Okay. Mr. Smith, do you have it to share?

MR. SMITH: I do. And I'm happy to do it, but it's apparently disabled on your end.

JUDGE BROOKS: Okay. I thought I had enabled it. Let's see. It says multiple participants can share simultaneously. Have you tried it again?

Looks like it might be working now, which is good.

MR. SMITH: Let me know if you can see it.

JUDGE BROOKS: It says -- all right. Okay.

MR. HOLDSWORTH: We can see it, yeah.

BY MR. SMITH:

Q Mr. Zuech, can you see that okay?

A Yep. I do see it now. Yep.

Q And do you see September 27th, 28th, 29th of the year 2022?

A Yep, all in LN with the subcode of DG, 9 hours.

Q Yeah. And what -- do you know what that subcode means?

A That is PPL, paid parental leave.

Q Okay. And is this -- does it have your name as the employee ID up at the top?

A Yes.

Q Okay. Is this the timecard essentially that you would

have submitted or concurred in to your first line supervisor?

Deleted: 206

A There -- I think Laura spoke about it on the 26th. I should have been granted more hours annual leave or sorry, of regular time for the union grievances and everything. But for those three days, yeah, it looks like -- looks like it is correct on the -- on those three. Sure.

Q Okay. Just maybe I didn't ask it very well, but are you the one who submitted this time to your supervisor?

A Yeah. I -- I'm -- either I filled it out like this. I don't know if I -- I'd have to look in the system to see if I concurred with it. If I didn't concur, then Lori just went in and certified it. There was quite a few time cards that she did that on that she certified without me concurring on. So I'd have to verify that. Because if I didn't concur, then she possibly made the changes to this timecard itself rather than me making the timecards to it. Because just like it says March 27th of 2023, it says date adjusted. So I don't know what was adjusted on it.

Q But, in general, it was the process that you submit or input your time in the timekeeping system and concur before it even gets to your supervisor?

A Supposed to, yes. But like I said, there was multiple times that Lori changed my time card. That was yet another grievance that I had against her was timecard fraud, because she manipulated my timecard incorrectly from the time that I

should have been granted.

Q Well, are you suggesting then that you did not enter this as paid parental leave for those three days or that Laurie did it?

A So I'm concurring that I know that I submitted those three days, the 27th, 28th, and 29th of September 2022 as paid parental leave. But as for the rest of the time, I don't know if she has changed it or not.

Q I'm just asking those three days. Did you do those two days?

A Yes, those three days I did.

Q And those same three days, right, you were in the mountains camping -- hunting with your father, as I understood it. Is that correct?

A I had my family with me. We were up camping, we were fishing, we were riding the four-wheelers around, just hiking around and everything else, just as family.

Q Did anyone in your party have a deer or an elk or some kind of a hunting tag?

A My dad did, yes.

Q Did you have a tag for the fall of 2022?

A Not a deer tag. I had an elk tag, and that was for October -- I think it was October 8th of 2022. That was when my hunting actually started.

Q When did your dad's hunt begin?

Deleted: 207¶

Deleted: 208¶

A My dad's hunt began the 27th of September of 2022.
Q Okay.
A That was just when -- and like I tried to explain to Lori, we like going up as a family. We did it again this year, that my dad ended up drawing another deer tag. I didn't draw one. And we went up earlier this year. We went up on a Tuesday this year, and my dad's hunt started on Wednesday, and I brought my family up, and we just go and ride around on the side-by-sides, go visit people, go fishing, like just have fun and everything before our elk hunt starts.
Q Okay. So your dad's hunt and tag began on the 27th of September. Is that right?
A If I remember right, yes. It was the 27th, or it was the 31st. I don't know exactly. I'd have to look up the dates. I know they started it on a Wednesday this year, but I think that they might have started it Saturday last year.
Q And you were camping there with him during those three days?
A Yes.
JUDGE BROOKS: Wait. Can you hear me? I got confused, because I thought you were talking -- you were asking him about last year. And then it kind of blended into this year. When -- I assume when you were asking him if the 27th on his father's tag hunting period started, that you were asking him about last year. Right, Mr. Smith?

MR. SMITH: Yes, Judge. That's correct. I'm speaking only of the year 2022.

JUDGE BROOKS: Okay. And he said the 27th or the 31st. I don't want to hear about this year, because that would just be confusing. And I assume you're talking about last year, Mr. Zuech. Okay?

THE WITNESS: Yes. Yes. That's what I am trying to clarify. I don't know, because they changed the dates on us this year to open it on a Wednesday. So I think that it was on a Saturday last year. So I'm thinking it was September 31st or --

MR. HOLDSWORTH: Not on September 31st.

THE WITNESS: Sorry. October 1st, sorry.

BY MR. SMITH:

Q So as I understood your testimony on the 26th of September 2022, you were involved in a meeting with Labor Relations. Lori was present. You were present. Is that right?

A Yes, that is correct.

Q And the purpose of that meeting was to discuss one of your grievances?

A Two of them.

Q Two of them?

A Yes, the first two that I filed.

Q And did you have more grievance meetings scheduled for that same week later in the week?

Deleted: 209¶

Deleted: 210¶

A No. No, I didn't. No.
Q And the 26th of September 2022 meeting, did you suggest to Lori that you would drop a grievance if she would grant your annual leave request for the 27th, 28th, 29th of September?
A No, I did not say that. If you want me to explain, I can.
Q Did you talk to Lori in that 26 September meeting about hunting?
A About going hunting and camping, yes.
Q Did you mention anything to her about tags or a tag drawn?
A She -- again, yes. I said you don't know which tags you're going to draw and which ones you're not going to draw. And again, my dad drew a tag, and I didn't.
Q Did you cancel any activities, meetings for the 27th, 28th, 29th of September?
A No, I did not. There was no meetings actually scheduled for that. The only meeting was the 26th of September.
Q As I understood your testimony, your accommodation requests paperwork you were working on in February of 2023; is that right?
A That time frame sounds correct, yes.
Q Okay. And you were barred in March of 2023.
A Yes.
Q Did Lori or Dr. Ybaben ask you to work with your provider to provide more documentation?
A No, they did not.

Deleted: 211¶

Q Did they ask you to complete -- incomplete paperwork?
A On the reasonable accommodation, the first one Lori said -- again, that I needed all my medical documentation. That's when I requested an extension, and she says if you're not going to have it, then you're -- I'm going to deny this reasonable accommodation until you get the -- get all your medical documentation submitted. So she denied it, and then I literally received it, I think, the next day all my medical documentation. And then I resubmitted it with new dates to Lori and Thomas.
Q You resubmitted medical documentation?
A Yes. I was -- again, I wasn't in the right state of mind that I didn't know who to send it to, what to send it to, so I sent it to Lori. And then she came back and said, TJ, you're not supposed to send anything pertaining to medical, personal information like that to me. You need to send it to the district. So then I just took it and sent it to Lindsay after that.
Q You sent it to Lindsay? How did you send it to Lindsay?
A Through email.
Q You sent your medical documentation through email to Lindsay.
A Yes. That's what -- Lori provided me email address.
Q Do you know who Lindsay is or where she works?
A No, I have no idea who she is. I just trusted Lori that

she -- if I needed it, needed to send her these, and that's who I sent him to.

Q And you used the word resubmitted. So had you submitted it previously?

A Yeah. And that was the one that Lori denied the extension, because I was within one or two days of receiving my medical documentation with my provider. It's just they hadn't gathered it for me, and I knew I was running out of days, and I think it was the 21st of July, I think, and --

Q Perhaps -- sorry. Perhaps we have a misunderstanding. When you say you submitted something, you submitted your paperwork or the medical documentation to substantiate the request?

A I submitted the request very first, and she said that you needed to provide me the medical -- it needs to have the medical documentation with it or I told her I don't have the medical documentation. I'm waiting for my provider to give it to me, and then I'll submit that. And she said I'm I can't submit this without medical documentation. So I waited and waited up until literally the day or the afternoon that it was due, and I sent her an email saying I don't have my medical documentation. I'm still waiting on it. Can you give me an extension on this reasonable accommodation? She stated no, I cannot. It's denied. Once you get your medical documentation, you can resubmit your reasonable accommodation.

Deleted: 212¶

So I received my medical application either the next day or the day after from my provider, and then I changed the dates on the reasonable accommodation to like the new issue date and the new submission date, and then I send the medical documentation with the reasonable accommodation form in to Lori and Thomas. That's when she said you can't send me medical information or private information like that. You need to send it to -- all that kind of stuff to Lindsay Strickland.

So then I just took that email, and I forwarded it over to Lindsay Strickland. So I submitted it twice. I was denied once, because she wouldn't give me the extra days. The second one I submitted, she told me I needed to send it to Lindsay, so I did send it to Lindsay.

Q And what became of it then?

A I never heard a word since.

Q When was the last time you came to work at Hill Air Force Base?

A To work was June 29th of 2022. But I have been on base since so to file grievances to have meetings with management that I was on regular time.

Q Thank you. I have nothing further.

THE COURT REPORTER: Your Honor, this is the court reporter speaking. I hate to interject. I have -- can we go off the record for about five minutes?

JUDGE BROOKS: Okay. Sure. Let's go off the record.

Deleted: 213¶