# EXHIBIT D

UNITED STATES OF AMERICA

MERIT SYSTEMS PROTECTION BOARD

DENVER FIELD OFFICE

| | |
|---|---|
| TJ ZUECH, Appellant, | DOCKET NUMBER: DE-0752-23-0253-I-1, DE-0752-23-0270-I-1 |
| v. | |
| DEPARTMENT OF THE AIR FORCE, Agency. | October 31, 2023 9:08 A.M. |

TRANSCRIPT OF HEARING
BEFORE ADMINISTRATIVE JUDGE DAVID BROOKS

APPEARANCES:

| | |
|---|---|
| For the Appellant: | By: David J. Holdsworth, Esq.<br>Law Office of David J. Holdsworth<br>9125 Monroe Plaza Way<br>Suite B<br>Sandy, UT 84070 |
| For the Agency: | By: Dustin W. Smith, Esq.<br>Civil Law Division, 75 ABW/JA<br>6026 Cedar Lane<br>Building #1278<br>Hill AFB, UT 84056 |
| Court Reporter | Jill Piper<br>eScribers LLC<br>7227 N 16th Street, Suite 207<br>Phoenix, Arizona 85020 |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

I N D E X

| | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| WITNESSES FOR AGENCY: | | | | |
| Laura Haislip | 5 | 15 | | |
| Lori Masero | 20 | 71 | | |
| Aimee Tarbet | 87 | 116 | | |
| Marc Ybaben | 122 | 138 | 144 | |
| WITNESSES FOR APPELLANT: | | | | |
| Trevor Taylor | 146 | 151 | | |
| TJ Zuech | 153 | 202` | | |
| Natalie Zuech | 214 | | | |

Deleted: 86¶

MR. SMITH: I have no further questions, Judge. Thank you.

JUDGE BROOKS: Thank you.

Okay. This will conclude the witness's testimony.

For the duration of this proceeding, you are instructed not to discuss the substance of your testimony with anybody. Thank you for coming in today. And you are free to go.

THE WITNESS: Thank you.

JUDGE BROOKS: Thank you.

The time is 12:39 p.m. Let's go off the record.

(Off the record at 12:39 p.m.)

JUDGE BROOKS: The time is 1:08 p.m. We are back on the record. Appearing now as a witness is Aimee Tarbet. Ms. Tarbet, I'm David Brooks, the administrative judge assigned to decide this matter. Do you have any objection to testifying under oath?

MS. TARBET: No, sir.

JUDGE BROOKS: Okay. During your testimony, if you have questions or are confused, you should direct any questions you have to me. Would you please raise your right hand for the oath?

AIMEE TARBET, AGENCY'S WITNESS, SWORN

(Witness testifies telephonically)

JUDGE BROOKS: Thank you. For the record, would you

Deleted: 87¶

please state and spell your name?

THE WITNESS: My name is Aimee Tarbet. A-I-M-E-E. Last name T-A-R-B-E-T.

JUDGE BROOKS: One T?

THE WITNESS: One T.

JUDGE BROOKS: All right. The first party that will ask you questions is the Agency.

Mr. Smith, you can begin.

MR. SMITH: Thank you, Judge.

DIRECT EXAMINATION

BY MR. SMITH:

Q Aimee, by whom are you employed?

A I am -- I am employed by the Air Force Nuclear Weapons Center, Minuteman III, (audio interference).

Q And how long have you been employed with the Air Force?

A Almost 15 years.

Q What is your current job title?

A Right now, I am the Minuteman III Sustainment Division Chief.

Q And how long have you been in that position?

A About four and a half years.

Q Can you tell us what your organization does? What is its mission?

A Our organization is responsible for sustaining the land-based leg of the nuclear triad. There are three legs of the

Deleted: 88¶

nuclear triad. Bombers, ICBMs, and submarines. And ours is the inter -- intercontinental ballistic missile. So our mission is to keep the 400 nuclear missiles on alert, operationally safe, suitable, and effective 24 hours a day, 7 days a week, 365 days a year.

Q What's the purpose of that?

A The purpose of that is -- well, in today's geopolitical climate, the purpose of that is to keep China and Russia at bay.

Q For defense of our nation; is that what you're saying?

A It is the defense of our nation.

Q Are you acquainted with Mr. TJ Zuech?

A I know of TJ I'm not well acquainted with TJ.

Q Are you in his -- or were you in his chain of command prior to his removal?

A Yes. I am his third-level supervisor.

Q Okay. Were you the deciding official in the matter now being appealed?

A I was the deciding official, yes.

Q Both as to the indefinite suspension and the removal?

A For both of those, correct.

Q Do you recall what Mr. Zuech's job title was?

A Yes. He was the equipment specialist for nuclear ops.

Q And what does an equipment specialist do?

A An equipment specialist is responsible for ensuring that

the technical data for the weapon systems for the technicians is accurate.

Q Do you have an acronym or an abbreviation for an equipment specialist?

A We call them ESs.

Q Wel, is Mr. -- is the job, the position of Mr. Zuech had, would they have -- do they have -- it requires that they have access to classified information, materials, and location?

A Not all equipment specialists are required to have -- to be on classified position descriptions. But because of the nature of our business, all Air Force Nuclear Weapons Center employees are required to be on position systems in which security must be -- must be maintained.

Q And was Mr. Zuech required to maintain that clearance?

A Yes. And there's actually a nuance with the part of the subsystem that Mr. Zuech was chartered to help sustain. And that is it is the highest classified subsystem on the Minuteman Series weapons system. He was a part of the reentry system, reentry vehicle branch. And that branch is actually the one that interfaces with the Department of Energy. The Department of Energy sustains the actual nuclear war. So the classification expectations for that particular branch are even higher than the rest of the equipment.

Q Did the position that Mr. Zuech occupied require access to the installation at Hill Air Force Base?

Deleted: 89¶

A Yes. In order to access -- access the -- the classified vault.
Q Could his job be done without access to the installation at Hill Air Force Base?
A There are parts of all of our jobs that would allow us to telework occasionally, or do it outside of the base, but the substantive parts of our job have to be done (audio interference).
Q Do you know if Mr. Zuech's access to classified information and locations was suspended?
A Yes, it was.
Q Do you know if Mr. Zuech's access to the installation at Hill Air Force Base was revoked or that he was barred from the installation?
A I was briefed by my security manager that the installation commander issued a barment order that they (audio interference).
Q March of what year?
A 2020.
Q Do you have any involvement in the process of suspending access to -- to classified information or to barment issues as it pertains to this installation?
A No. Neither of those decisions were in my jurisdiction.
Q Now, it's always the deciding official in both of these matters; what was your responsibility?

Deleted: 90¶

A My responsibility was to determine if the charges against them were substantiated by the evidence that was presented. And then if that -- if that -- if I found that those charges were substantiated, then I have to assess them.

JUDGE BROOKS: Hold on. I didn't -- I didn't quite hear the last part of the answer. I don't know if Mr. Holdsworth is saying the same thing.

MR. HOLDSWORTH: Yeah, it kind of tapered off there at the end, so I didn't catch the whole thing.

JUDGE BROOKS: I did hear job to determine if the charges were substantiated. The rest of it I didn't get.

A And then once I made a decision whether or not the charges were substantiated by the evidence, then I had to make a decision on what the appropriate penalty would be for (audio interference).

JUDGE BROOKS: Everybody hear that okay? Great. Thank you.

MR. SMITH: I'm going to draw everyone's attention to tab 14 of the initial appeal file, page 153. I have that pulled up in front of Ms. Tarbet. And would like to ask her some questions about that, if I may?

JUDGE BROOKS: Yes, I am there as well. It's the proposal. Thanks.

MR. SMITH: Thank you, Judge.

BY MR. SMITH:

Deleted: 91

Q Ms. Tarbet, do you recognize the document in front of you?
A Yes.
Q Can you tell us what it is?
A It was a Notice of Proposed Removal.
Q And to whom was it addressed?
A It was addressed to TJ.
Q Okay. And in paragraph 2, are you able to identify what the charges were in this matter?
A Yeah. There were three charges against TJ's (audio interference) unbecoming, inability to perform duties, and lack of candor. Which, this particular proposal, that was the third lack of candor charge against TJ in this calendar year.
Q So you're saying he had prior discipline that included lack of candor?
A Prior. Yes, prior discipline. Two additional charges of lack of candor in January and March of 2023. He'd also been counseled as well as well as reprimanded and had a ten-day suspension.
Q So as to these charges -- as to each one of them individually, were you able to reach a conclusion on whether the charges were substantiated?
A I found all three charges to be substantiated after reviewing the almost 500 pages of evidence.
Q So what -- what evidence are you talking about that you

Deleted: 92¶

Deleted: 93¶

received and reviewed?
A It was provided to me by employee relations.
Q Is it the typical discipline package that comes to you when you're a deciding official?
A Yes.
Q Was Mr. Zuech provided notice of these charges?
A Yes, he was.
Q Was he provided an opportunity to respond to these charges?
A He was. And he did respond to the indefinite suspen -- proposal to indefinitely suspend charge.
Q Okay. Did he respond to the charges of misconduct that you're looking at on page 153?
A Actually, I don't really (audio interference).
Q Okay. I'll draw your attention then, to page -- I believe it's 145.
A It's complex because there were -- there were the interactions on the indefinite suspension proposal (audio interference) decision at the same time, there were interactions on the notifications to the proposed removal as well. Okay. Yes. Yes. I remember these (audio interference).
Q Okay. So let's just be clear. You recall distinctly that he responded to the proposal to indefinitely suspend him?
A Yes.

Q You heard that reply?

A Yes.

Q Or received that reply? Did -- and then my question was, did he respond to the proposal to remove him?

A Yes, he did.

Q And how did he respond as to both of those matters?

A They were faxed to employee relations and then employee relations scanned them and emailed them to me.

Q And from you. Where did these responses come?

A From employee relations.

Q But it was prior to --

A (Indiscernible, simultaneous speech) --

Q -- prior to employee relations?

A From Mr. Holdsworth to the employee relations office, and then they would scan them and email them to me.

Q Okay. And is that the case for both the indefinite suspension matter and the removal matter?

A Yes. That was (audio interference).

Q Okay. So Mr. Holdsworth representing Mr. Zuech in both matters?

A Yes, he did.

Q And responded on behalf of Mr. Zuech in both matters?

A Yes.

Q All right. And just so we're clear. In writing. They were faxed in; is that right?

Deleted: 94¶

Deleted: 95¶

A That's right.
Q Was there an oral reply of any kind on either matter?
A No.
Q Having reviewed the file and received Mr. Zuech's responses in both matters, what then, was your responsibility?
A I was asked to determine if -- the -- as the deciding official, I have to determine whether or not to go on to make a different decision, change my decision, (audio interference). Neither case did I offer (audio interference).
Q Okay. You reviewed the proposal that was in front of you. Is that what you mean by change the decision?
A Yes, yes. Review the proposal.
Q Review the proposal. And what was your responsibility as it pertains to the proposal? What was your job? You had a proposal in front of you, and your job is to do what?
A It would be (audio interference) substantiated charges.
Q And we already talked about that. So having -- having concluded that the charges were proven, what was the analysis you then engaged in?
A Well, this was the fifth time that I've been a management deciding official. And the notice to -- decision to remove. And in all of those cases, and in this one as well, I reviewed the 14 Douglas factors for every single step.
MR. SMITH: Okay. So I'm going to draw everyone's attention to page 144 of tab 14 of the initial appeal file. I

Deleted: 96¶

have that brought up in front of the witness.

JUDGE BROOKS: That's fine. Proceed.

MR. SMITH: If I may proceed? Is everybody there okay? Just making sure.

JUDGE BROOKS: Yes. I said that's fine. You can proceed.

MR. SMITH: Thank you, Judge.

BY MR. SMITH:

Q All right, Ms. Tarbet, looking at page 144, do you recognize this document?

A I do recognize this document.

Q Okay. Under "employee's name", who is it?

A TJ Zuech.

Q And the O-R-G or the org to the right, what is that?

A So it's the organization is Air Force Nuclear Weapons Center, and his -- his particular organization code, MMS stands for Minuteman III Sustainment. R stands for reentry. So that's (audio interference).

Q Okay. And at the bottom of that document, do you recognize the signature?

A That's my signature.

Q Above the signature block that says Aimee R. Tarbet, managing official?

A Yes, that is my signature.

Q Okay. So are these the 14 factors that you considered as

Deleted: 97¶

you reviewed penalty selection in this matter?
A Yes. These are the 14 factors we're required to consider as part of the (audio interference).
Q Okay. I'd like to go through each one of these and find out what it is you considered and what your analysis was as to each one of these factors. And so I'm going to ask you to read a factor and then answer that question as to that factor, if you would please.
A Yes.
Q So let's start with number 1. Will you read that and then answer that question?
A Okay. The first factor is "The nature and seriousness of the offense and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical, or inadvertently, or was committed maliciously or for gain, or was frequently repeated". So on the first --
JUDGE BROOKS: Let me just interject one thing. I don't -- I don't need the factors to be read. You can -- you can just say one or two summary word that'll just save us a little time if you don't have to read all of that verbiage. But thank you.
MR. SMITH: Thanks, Judge.
THE WITNESS: Thanks, Judge.
A Okay. So on the first one, "The nature of the seriousness

Deleted: 98

of the offense", on the first charge, on conduct unbecoming. As I was reviewing the evidence file, I just literally kept picturing our organization being on the 6:00 news as a disgruntled employee was committing an active shooting event. And so quite frankly, I thought the nature of the offense was incredibly serious because it affected the safety of 200 employees in the building that TJ was allowed to access prior to this audio interference. So that was the seriousness of the offense on the first charge.

The serious -- seriousness of the offense on lack of candor. Because this was TJ's third charge of lack of candor and it talks about being frequently repeated. TJ continued to present himself in a way that his supervision could not trust. And so that was the second charge.

The third charge for inability to perform duties. He -- the seriousness of the offense that caused debarment resulted in his inability to perform his duties. And so we had to actually go out and get permission from the senior executive service member that is at the head of the Nuclear Weapons Center, get an overhire in order to do TJ's job, because it -- he basically abdicated his duties (audio interference). Okay. If we're good on that one, I'll move to the second one.

BY MR. SMITH:

Q Okay. What did you consider as to factor number 2?

A Okay. So for factor number 2, I'll go back to the

seriousness and importance of maintaining security clearance in order to work on nuclear weapon systems. And so his -- his role and prominence in his position required him to maintain access to base and access to (audio interference), and he was unable to do those.

Q Ms. Tarbet, I'm going to interrupt you because I -- just to speed things along and be more efficient here. As to each factor, I'm going to ask you what it is you considered.

A Yes.

Q But I'm also going to ask you an additional question as to each factor about as you weighed it, in which direction did it weigh in your decision?

A Right.

Q Does that make sense?

A Um-hum.

Q So let's -- let's have you answer that question as to number 1, too. How did it weigh in your mind?

A It weighed in my mind that I couldn't -- I couldn't sacrifice the well-being -- potential well-being and safety of almost 200 people over the well-being of (audio interference).

Q And as far as a penalty selection, how did it weigh in your mind?

A So all three of the charges have a penalty selection, including up to removal. And I thought, because of the seriousness (audio interference).

Deleted: 99¶

Deleted: 100¶

Q As to factor number 2, same question.
A Yeah. So if we can't trust an employee to be honest and then compounded with the fact that they can't maintain a security clearance, I weighed -- I weighed how we would be able to trust them with any other workload that we have, and it made more sense to remove him.
Q Okay. So let's go to the third factor, please.
A TJ had two prior lack of candor charges at the beginning of this calendar year. He also had a counseling, a reprimand, and two-day suspension. None of those things motivated TJ's behavior to improve. In fact, it continually got worse. And so I'm not -- the past disciplinary record, one it existed, and two, it was also a serious nature. But we -- at those times I decided on a penalty less than removal hoping we could remedy it.
Q So as you consider factor 3, how did it weigh? In -- in which direction did it weigh for you?
JUDGE BROOKS: Move on.
BY MR. SMITH:
Q The fourth factor then, please.
A The fourth factor I focused most on ability to get along with his fellow coworkers. So clearly, he was verbalizing his dream about shooting a coworker. He wasn't doing a very good job getting -- getting along with others in the workplace. And I thought that that charge and the safety -- the risk of the

safety of others certainly warranted removal.

Q What was his length of service and past work record that you considered?

A So in -- in the evidence, I think TJ had 15 years of service and never had any prior -- prior to 2022, he didn't seem to have any performance problems on the job. This is all about to begin in 2022.

Q So prior to 2022, how did that weigh in your mind? That factor?

A I didn't -- I wasn't in TJ's chain of command prior to him arriving to the Nuclear Weapons Center, so I don't really consider that all that relevant relative to the three charges at hand and the seriousness of those charges.

Q The more recent --

A The more recent.

Q -- events? So in 2023, in which direction did it weigh?

A Well, it definitely weighed toward removal because the (audio interference) lack of security clearance and -- and then of course the conduct unbecoming.

Q Okay. Anything else there that you weighed or considered?

A No.

Q All right. The fifth factor, please.

A The fifth factor was about the employee's ability to perform at a satisfactory level. And all I will say here is that for months, the supervision was begging him to return to

Deleted: 101¶

Deleted: 102¶

work because we were so far behind from a workload perspective, but we were losing our operational credibility as a warfighter. We were behind on engineering orders he was supposed to be managing, technical orders he was supposed to be managing. And he continued to abdicate those duties to the point where, as I testified earlier, we had to go get an overhiring order to burn down that backlog and perform the duties for the warfighter.

And so I guess I would just say he didn't perform at a satisfactory level. In fact, he put our team at a disadvantage, the warfighter at a disadvantage, and leadership at a disadvantage. And so as I weighed that, knowing that there wasn't any way that we could reshape his job duties not to be anywhere other than on base and not maintain his security clearance, it weighed towards removal.

Q Right. What would you say as to supervisor's confidence in his ability to perform his duty?

A Well, he just quit doing his job. So his supervisor didn't have any confidence (audio interference).

Q On the sixth factor?

A The consistency of the penalty with the guide to disciplinary action. So I looked at those. Every single time at Nuke Weapons Center when someone's unable to maintain a security clearance, we go through the process of removal.

Q It's that important?

Deleted: 103¶

A It is that important.
Q How come?
A Because it's -- I have classified -- highest classified mission (audio interference).
Q Are there viable alternatives to removal?
A I think there could have been viable alternatives to removal prior to the barment -- prior to the loss of security clearance and if the previous disciplinary actions had warranted any kind of change in behavior.
Q And you didn't see a change in behavior?
A No. It continued to get worse based on the evidence.
Q What was the range of range of penalties for the three charges?
A It fell anywhere from a letter of repri -- counseling, letter of reprimand, all the way up to (audio interference).
Q The seventh factor?
A Consistency of the penalty imposed upon others for the same or similar offenses. So TJ's actually being charged with three things: conduct unbecoming, inability to perform duties, and lack of candor. The inability to perform duties one is -- is -- that charge alone is grounds for removal. And like I said in my previous response in the last section, that's what we do with folks that can't maintain security clearance. We need (audio interference) to remove.
But then on top of that, TJ also had two additional

charges: conduct unbecoming, which I found to be a serious safety risk for the rest of the organization. And he also had the third charge of lack of candor. So we've removed folks for a lot less.

Q The next factor, please.

A Okay. The mitigating circumstances surrounding the offense. So inside the evidence file, it was obvious that -- that TJ is struggling, maybe with some mental wellness issues. And -- and while I -- and I actually have quite a bit of sympathy for TJ because it's obvious too that it was related to frustrations about the work environment. But at the end of the day, when I weighed that again, I couldn't weigh -- I couldn't outweigh TJ's mental health over the health and wellness of (audio interference).

Q Did you consider anything about the impact upon the reputation of the Air Force as you considered penalty selection for TJ?

A Yes. I -- again, our operational credibility with the warfighter was taking a substantial hit. At the time, those duties had been abdicated. It took us about four months to get an overhire in place, and an additional two months to get that overhire trained and up to speed to take over the workload and then begin to burn down the backlog. So yes, I was concerned that Global Strike Command, which is our primary major command and our primary customer, was really losing faith in our

Deleted: 104¶

Deleted: 105¶

ability to support the mission.
Q Okay. So did that weigh in any particular direction for you on that factor?
A It did. We couldn't continue -- we couldn't continue to employ TJ under those circumstances.
Q Okay. The next factor, please. What did you consider?
A Okay. So this talks about alternate -- alternate -- alternative sanctions. And again, I think maybe this is (audio interference).
Q Which one are you on?
A Number 12.
JUDGE BROOKS: Just one second. Sorry. Okay.
MR. SMITH: We lost you, Judge.
JUDGE BROOKS: Sorry about that. You can continue.
BY MR. SMITH:
Q Okay. I think we're on to factor number 9, if I'm not mistaken.
A Sorry, I skipped 3. Okay 9. (Audio interference) the employee was on notice of the rules they're violating. So TJ was notified. He was on notice. Like I said, all of his disciplinary actions started in January, so we actually had months before debarment to -- basically to remediate and come back to work, do his job, and -- and kind of correct the actions that had been documented. And he didn't. And we had -- like I said, the burden was placed on us to figure out

how to resolve the backlog and get someone else trained up to do his job.

Q And how did that weigh, if any, direction as you consider that factor?

A Yeah, he couldn't -- because he couldn't come on base because he couldn't maintain, he couldn't do his job. So it weighed in the direction of removal.

Q Okay. Number 10?

A I've already talked about this as I considered the other factors, but we -- we really didn't have a lot of confidence that the employee could rehabilitate based on the fact that we had been incentivizing him for several months.

Q He had had prior discipline?

A Yes.

Q And his behavior not improved?

A Behavior not improved.

Q And so --

A Okay. And I actually already answered number 11, (audio interference).

Q Well, back to 10. How -- how did that weigh, if any, direction?

A That the employee wasn't remediating their behavior based on prior disciplinary action and their behavior continued to get worse. We had low confidence that an alternative to removal was going to be successful.

Deleted: 106¶

Deleted: 107¶

Q And then you said something about 11?
A I had already talked about 11.
THE WITNESS: I apologize, Judge, I had jumped to that.
A That was where I said that in the evidence file, it was obvious that TJ was struggling with mental wellness and mental health and that it was clear that some of that was attributed to dissatisfaction with the workplace. But again, as I weighed the factors, weighed the health and well-being of the single employee against the risk of the well-being of -- of the 200 employees that are in the (audio interference).
Q So as to factor 11, how did that weigh in which direction or both -- or what directions -- how would you answer that?
A Well, I think 11 was the hardest one for me because I really -- I really am sympathetic to TJ's plight and some of the circumstances I'm which -- that -- that he's trying to navigate through, and I'm hopeful that he can find a job that doesn't have these requirements. He'll be able to perform it, but it isn't in (audio interference).
Q Is there alternatives within your organization that you could have done or could do?
A Not without a security clearance.
Q Factor 12?
A Yes, sir. (audio interference). Adequacy and effectiveness of alternative (audio interference). So I talked

about this a little earlier, but we're unable -- at Nuclear Weapons Center, we're unable to employ individuals that can't maintain security (audio interference). So other -- the other alternative sanctions that were considered would have been counseling, notice of reprimand, a temporary suspension, all of which were affected in January (indiscernible) change in behavior. So it weighs -- weighed in my decision to move forward with removal.

Deleted: 108¶

Q Have we covered all the factors, ma'am?

A We've covered all the factors.

Q Anything else as it pertains to the factors that you considered or how it weighed in your decision-making process?

A I don't have anything.

Q Okay. I just want to make sure that we're all on the same page on a couple of things. I'm going to draw your attention to page 160 of tab 14. Do you recognize this document, Ms. Tarbet?

A I do recognize it.

Q And what is it?

A It was a Notice of Debarment.

Q Okay. Is -- is that what you considered when you were deciding whether the charges were substantiated?

A Yes. I did consider the notice.

Q Okay.

THE COURT REPORTER: This is -- this is the court reporter

Deleted: 109¶

speaking. Can you just speak up a little bit more?

THE WITNESS: Yeah, I can speak up more. Sorry.

BY MR. SMITH:

Q And I'm going to draw your attention to one last thing in the file. Page 164 of tab 14. I believe it's a two-page document. Do you recognize this, Ms. Tarbert?

A I -- yes, it was in the evidence file.

Q And I realize that much of it appears to be redacted, but can you tell what it is?

A It's -- it's -- it says it's a (audio interference).

Q Okay. But was this in the evidence file that you considered?

A Yes.

Q And what --

JUDGE BROOKS: I didn't hear the description of what it is.

THE WITNESS: The assessment of TJ's mental health by his medical providers.

JUDGE BROOKS: Okay. Thank you.

BY MR. SMITH:

Q And the date of the document, Ms. Tarbet, if you know?

A November 22nd, 2022.

Q And again, much of it's redacted for obvious reasons. But the unredacted portion if you would read that to yourself.

A Yeah.

Deleted: 110¶

Q Yeah.
A You want me to read it just to --
Q No. Just read it to yourself.
A Yeah.
Q And were you aware of that when making your decision as to whether the charges were substantiated?
A Yes.
Q And what essentially does this note from the doctor tell you?
A It's an admission that he was taking time off to go (audio interference).

JUDGE BROOKS: I didn't get that.

BY MR. SMITH:
Q Time off for what?
A Hunting.
Q Okay. Were you aware -- are you aware of any defect in the process -- the processing of Mr. Zuech's denial or suspension of access to classified information?
A Do I --
Q Any deficiency in that --
A No.
Q -- process?
A No. I'm not aware of any.
Q Are you aware of any deficiency in the process of debarment order?

Deleted: 111

A No.
Q Could Mr. Zuech's position be done 100 percent remotely?
A No.
Q Why not?
A Because you have access to the vault to access classified information.
Q Is there anything else you have to have access to on the base? Or in his job description, job duty?
A Well, he --
Q That he couldn't do from remotely?
A It's really just the access to classified information.
Q Okay.
MR. SMITH: If I can have just a moment, Judge? I'm trying to collect my questions and thoughts here.
JUDGE BROOKS: Okay.
BY MR. SMITH:
Q Ms. Tarbet, how did Mr. Zuech's misconduct that we've reviewed impact the workforce and the workload?
A As soon as debarment was issued, my supervisor, Colonel Storms, actually lost access to our building. So we -- the only access to our building now is by a Vindicator (audio interference) to go into the building. And that -- and that change has affected all of us. So we're still -- we still maintain lockdown status ever since the debarment order. And so it's a convenience factor. But there was also -- it's kind

Deleted: 112¶

of an anxiety factor for the workforce. And all these people are aware that there was some kind of a verbal -- some kind of verbalization of a threat potentially to the workforce.

And so there was some anxiety. The building is still on lockdown. And then I can just reiterate that there was months' worth of backlog from TJ's that wasn't being done. And we had to appeal to the senior executive service. So he's the two-star general deputy at Nuke Weapons Center, requesting his approval to get an additional billet that -- that, in addition to the billet that we already (audio interference) at Nuke Weapons Center, now we were asking for an extra one in order to cover that workload. So pretty significant impact to those that were carrying the weight.

Q Since his removal, how has workforce/workload been impacted?

A So we were able to get the overhire approved about -- that took four months, and then another two months to get that individual trained up. But now, our backlog -- we're back on top of our backlog. We've improved our credibility with the -- with the major command as well as (audio interference).

Q How would you assess the effectiveness of your -- your organization with the removal of Mr. Zuech?

A The organization is much more effective and efficient now that Mr. Zuech has been removed, other than the fact that we spent countless hours on this case.

Deleted: 113

Q And I appreciate your answer. Can you give me examples or what or why or how you say you're more effective. How so?
A Well, our engineering order and technical order -- so there's two primary (audio interference). The engineering orders are changes to the technical baseline of the weapons system from a documentation management perspective. And the technical orders are actual technical data that we issued to technicians, whether they be active duty in the field or whether they're civilian technicians at the depot. We have to keep those documents updated in order for production and repair lines to stay operational. And so we had a disruption in those at the depot and at the field during TJ's abdication of his duty.
Q Is that better with him removed?
A Yeah. We're completely caught up, and we're meeting all of our EO and (audio interference) metrics now.
Q I believe I heard you say earlier that you had considered some alternative to removal. What were they, and -- and how would they have worked out? Could they have worked out?
A Well, as the NVO (phonetic) we're requested to consider those alternatives. And so I did consider counseling again. I did consider just a -- a letter of reprimand again. And I did consider a more temporary suspension again -- against the charges of lack of candor -- against the charge of lack of candor. But for the other two charges, inability to perform

his duty, there isn't a way -- there isn't an alternative sanction if you can't get on the installation to do classified work.

And on the other one, conduct unbecoming was again, the reason for debarment to begin with, so I didn't consider an alternative to that. Only (audio interference) can work. But because it had been the third offense, proposal for remove made the most sense.

Q Well, what was your final conclusion as to penalty in Mr. Zuech's case?

A Removal on all three charges.

Q So if each charge were considered separately you --

A Yeah.

Q -- you would remove him?

A Yes.

Q What was your final conclusion as to the proposed indefinite suspension?

A Sustained.

Q And why so? Why was that appropriate?

A Inability to perform his job security duties (audio interference).

Q If I can change topics here for a little bit. Were you aware of any requests by Mr. Zuech for an accommodation?

A No. Nowhere in the -- in the evidence file does it talk about a disability or any kind of a reasonable accommodation

Deleted: 114¶

Deleted: 115

(audio interference) need to consider.
Q And if in his chain of command, were you aware of any request for accommodation?
A I heard later that Lori had reached out to him and asked him if he was interested in doing a reasonable accommodation as well. I think she provided some paperwork, but I (audio interference).
Q Anything in your analysis as to the indefinite suspension or the removal that was influenced by any of this topic of an accommodation?
A There was -- there was no documentation of a disability in the evidence (audio interference).
Q So did it have any bearing on your decision to remove him?
A I wasn't even aware of it, so I'd argue (audio interference).
Q Would you have made the same decisions, regardless of the now alleged claims of discrimination because of an accommodation denial?
A I -- I hate to speculate on that. I would rather see the actual evidence detailing what the disability was and if his base provided some kind of accommodation. I think that's really not that relevant based on the fact that a disability shouldn't have prevented him from being able to maintain security nor access to the installation.
Q But did any of that request for an accommodation have any

Deleted: 116¶

bearing on your final decision?
A No. I was unaware until after.
MR. SMITH: I have no further questions, Judge.
JUDGE BROOKS: Mr. Holdsworth?
MR. HOLDSWORTH: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. HOLDSWORTH:
Q Hello, Ms. Tarbet, can you hear me okay?
A Yes, I can hear you.
Q I'll speak up. If I may, I just have a few questions for you. So I want to make sure I understand the issues for which you were the deciding official and those which you did not -- did not have any involvement in. As I understand your testimony, the decision to suspend the security clearance, you did not have any involvement in that decision?
A Correct.
Q But based on the suspension of the security clearance, the -- what followed the -- was the proposal to indefinitely suspend, you were the deciding official on that issue?
A Yes, that's right.
Q All right. And then with respect to the barment order, you did not have any involvement in -- in that decision?
A No.
Q But the removal that was proposed following the barment order, you were the deciding official with respect to the

removal?
A Yes.
Q All right. So you're not able to tell us whether, with respect to the suspension of the security clearance for the barment, whether there was any consideration of alternatives to either of those decisions, correct?
A No, sir. I don't have the authority to make either of those.
Q Well, not only did you not have the authority that you were not involved at all. All right. Now, with respect to the three charges that were in the proposed removal, we had the conduct unbecoming. Now, what was the conduct that was unbecoming?
A So in the evidence file, I read about a statement that TJ made at the union office where he verbalized a vivid dream that he had had about shooting the supervisor. And that was the consideration of unbecoming behavior.
Q Okay. Did he make that disclosure of his dream voluntarily as far as you know?
A As far as I know.
Q Was there any conduct that you became aware of that he engaged in, in trying to implement that dream or translate that dream into any kind of a reality?
A I have -- I have no knowledge of that.
Q All right. So the conduct we're talking about is a dream

Deleted: 117¶

that he had, which he then disclosed, right?
A Yeah. He verbalized the dream. That's right.
Q All right. And the inability to perform aspect or charge, that was hey, if you don't have a security clearance and if you're barred from the base, you can't do your job, right?
A That's right.
Q Now, you were asked about -- towards the end by Mr. Smith -- about whether Mr. Zuech could have done his job remotely. Now, he -- it is a fact, isn't it, that during the COVID pandemic, that during much of it, that he and many other staff members were remotely in their jobs? The employees that worked in the Nuclear Weapons Center?
A That's a fact. There -- there was not a single Minuteman III Sustainment leader that was not in the office every day during the COVID pandemic. And then we were -- we were there every single day so that when we needed folks who worked remotely, we could call them in to (indiscernible)
Q Sure.
A But that's not true. We were in a hybrid status during COVID, yes.
Q Perfect. All right. And if -- if he could have worked remotely that your, I think, explanation was that there still would have been a problem with accessing classified information or for the vault, right?
A (No audible answer).

Deleted: 118¶

Deleted: 119¶

Q All right.
THE COURT REPORTER: I didn't get an audible answer.
A Yes.
BY MR. HOLDSWORTH:
Q Do you know, could -- could he have done aspects of his job, equipment specialist, without a security clearance and even being barred from the base if he were working remotely?
A Yes. If he wasn't employed by the Nuclear Weapons Center (audio interference) loss of equipment specialist positions (audio interference) but that can stay unclassified and not have to maintain a security clearance. But the nature of our business requires every position to maintain security clearance.
Q And do you know whether there was any consideration as you went through your decision-making methodology of a transfer or a reassignment to a different equipment specialist position outside of Nuclear Weapons, where a security clearance was not required? Was that ever considered?
A I didn't feel like that would be a very moral consideration, considering the fact that TJ already had three charges of lack of candor, as well as the conduct unbecoming. I felt it would be irresponsible to recommend a transfer to another organization given the disciplinary record.
Q One other question. In your testimony, you talked about the fact, I think you used the term abdication -- of TJ's

abdication of his job or position was causing a loss of credibility with -- I'm not sure I caught the other organizations or entities that you mentioned. So who were -- what were those?
A So we work for Nuke Weapons Center who works for Air Force Global Strike Command. Air Force Global Strike Command is in Barksdale, Louisiana. They are the command for which they represent the warfighter. And so all of our deliverables for the weapon system are governed by that agency. And we were losing credibility with them because our metrics were trending so negatively with our engineering work and tech support.
Q Is the Air Force Global Strike Command -- is that the name of it?
A Yes, that's the name.
Q Okay. And was there another entity, or did I just misunderstand? Something about war or warfare? I may have misunderstood that.
A So there's the Air Force Nuclear Weapons Center. But we -- we're a directorate supporting the Air Force Nuclear Weapons Center there in Kirtland, New Mexico. And then they, as an entity, from -- from a weapons system perspective (audio interference) to Air Force Global Strike Command. (audio interference) requirements for the weapon.
Q All right. Okay. Thank you.
MR. HOLDSWORTH: No other questions.

Deleted: 120

Deleted: 121¶

THE WITNESS: Thank you.

JUDGE BROOKS: Mr. Smith?

MR. SMITH: I have no further questions, Judge. And we're prepared with Dr. Ybaben.

JUDGE BROOKS: Okay. And I'm going to release the witness with the instruction that this is an ongoing proceeding. And for the duration of it, you're instructed not to discuss the substance of your testimony with anybody. Thank you for coming in today. And you're free to go.

THE WITNESS: Thank you, Judge.

JUDGE BROOKS: Thank you.

It's 1:58 p.m. Let's go off the record.

(Off the record at 1:58 p.m.)

JUDGE BROOKS: The time is 1:59 p.m. We are back on the record. Appearing now as a witness is Marc Ybaben. Sir, I am David Brooks, the administrative judge assigned to decide this matter. Do you have any objection to testifying under oath?

MR. YBABEN: No, sir.

JUDGE BROOKS: During your testimony, if you have questions or are confused, you should direct any questions you have to me. Would you please raise your right hand for the oath?

MARC YBABEN, AGENCY'S WITNESS, SWORN

(Witness testifies telephonically)