# EXHIBIT E

UNITED STATES OF AMERICA

MERIT SYSTEMS PROTECTION BOARD

DENVER FIELD OFFICE

| | |
|---|---|
| TJ ZUECH,<br><br>Appellant,<br><br>v.<br><br>DEPARTMENT OF THE AIR FORCE,<br><br>Agency. | DOCKET NUMBER:<br>DE-0752-23-0253-I-1,<br>DE-0752-23-0270-I-1<br><br>October 31, 2023<br>9:08 A.M. |

TRANSCRIPT OF HEARING
BEFORE ADMINISTRATIVE JUDGE DAVID BROOKS

APPEARANCES:

For the Appellant: By: David J. Holdsworth, Esq.
Law Office of David J. Holdsworth
9125 Monroe Plaza Way
Suite B
Sandy, UT 84070

For the Agency: By: Dustin W. Smith, Esq.
Civil Law Division, 75 ABW/JA
6026 Cedar Lane
Building #1278
Hill AFB, UT 84056

Court Reporter: Jill Piper
eScribers LLC
7227 N 16th Street, Suite 207
Phoenix, Arizona 85020

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

I N D E X


| | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| WITNESSES FOR AGENCY: | | | | |
| Laura Haislip | 5 | 15 | | |
| Lori Masero | 20 | 71 | | |
| Aimee Tarbet | 87 | 116 | | |
| Marc Ybaben | 122 | 138 | 144 | |
| WITNESSES FOR APPELLANT: | | | | |
| Trevor Taylor | 146 | 151 | | |
| TJ Zuech | 153 | 202` | | |
| Natalie Zuech | 214 | | | |

judge assigned to decide this matter. Do you have any objection to testifying under oath?

MS. MASERO: (No audible response)

JUDGE BROOKS: There wasn't any audio. I'm sorry.

MS. MASERO: No, sir.

JUDGE BROOKS: Thank you. During your testimony, if you have questions or are confused, you should direct any questions you have to me. Would you please raise your right hand for the oath?

LORI MASERO, AGENCY'S WITNESS, SWORN

(Witness testifies telephonically)

JUDGE BROOKS: For the record, would you please state and spell your name?

THE WITNESS: Lori Masero, L-O-R-I M, as in mother, A-S-E-R-O.

JUDGE BROOKS: Thank you. The first party that will ask you questions is the Agency through Mr. Smith.

MR. SMITH: Thank you, Judge. We were just working on the audio to help everybody here as best as possible.

DIRECT EXAMINATION

BY MR. SMITH:

Q I'm going to ask you, Lori, to speak up as loud as you can, and I'll be the one asking questions. So you can hear me okay?

A Yeah.

Deleted: 20¶

Deleted: 21¶

Q Yes. This is the camera and the microphone. Lori, by whom are you employed?
A Hill Air Force Base.
Q Is that the Department of Air Force?
A Yes.
Q And how long have you been employed by the Air Force?
A A little over 19 years.
Q What is your current position?
A Supervisor.
Q All right. In which organization?
A (Audio interference).
JUDGE BROOKS: I barely heard that answer. So you'll need to increase volume. Sorry.
A I work in the Nuke Weapons Center in the RS/RV Branch, the Minutemen III System.
BY MR. SMITH:
Q And when you see -- say the RSV (sic) Branch, tell us what that is, please.
A Reentry system, reentry vehicle is what that stands for. We work on the reentry vehicle for the intercontinental ballistic missile, so the nuclear weapon.
Q And what do we call this, ICBM, this inter-continental ballistic missile that you work on specifically?
A The RS/RV Branch, which is the (audio interference) branch that we work on.

Deleted: 22¶

Q And -- and for those of us who are nonnuclear weapons people, explain to us in simple terms what exactly this missile is, what it does, and how it arrives at its target.

A Sure. We work on -- the reentry system is the part of the missile that carries the nuclear weapon that carries the nuclear package that explodes when it's detonated. It's -- it's put into the air with the booster, so mainly the whole rocket. It goes up into a little bit into the atmosphere. Some of it breaks off. The reentry vehicle, which is a big part of what I'm over, comes back into the atmosphere and is guided to its target. And that target would -- would explode the nuclear bomb.

Q And then you say you're a supervisor in that unit. How many people do you supervise?

A Right now, I supervise eight. We do have an open position, so we're not filled. It will be nine.

Q And how long have you been in that supervisory position?

A It was two years in October. So just a couple of weeks (audio interference).

Q Okay. As part of your position and as a supervisor, are -- were you acquainted with Mr. TJ Zuech?

A Yes, I was.

Q How were you acquainted with Mr. Zuech?

A I was his coworker for two or three years, and then, I was his supervisor, in October, two years.

Q And prior to Mr. Zuech's removal, what was his position and his job title?
A He was an equipment specialist.
Q Do you have an abbreviation or an acronym for an equipment specialist?
A Yes. So an ES is what we call an equipment specialist.
Q And what does an equipment specialist do?
A They work on technical orders. They -- they will go to shops and (audio interference) on different things that we work on to help make sure that those technical orders in a way that people are handling and discharging assets are correct. They'll make changes to the technical orders when needed.
Q And -- and for those of us again who don't do your work, what -- what is a technical order?
A So every part Air Force-wide has a -- has a technical order that is basically a book that is used to repair, to -- to build, to modify. They're written so that a technician that is working on that -- that aspect and follow that to make sure they do all the procedures that we make sure they put in the right parts that they have replaced, and kind of like the bible for repair or what they do, and it has to be followed. Technicians and maintenance have to actually sign, at least they used to, the statement saying they will follow that to the letter.
Q Is the technical order a series of instructions what

Deleted: 23¶

technicians are supposed to do?

A It is. It's a series of instructions. It'll have a parts list. It is used if you need to replace a part. It has the configuration of the asset so that when it's put together or repaired, that can ensure that it's done correctly.

Q And when someone is following a technical order on an asset, what do you mean by an asset?

A So any of the things that we've worked on, like the reentry vehicle, would be an asset that's made up of a lot of parts of an item. So when everything is put together, that's the asset that you have to put together by those parts. Some of the parts within that can be an asset that's made up of other parts and then put into that.

So anything that we work on or repair or -- or have to do with basically are all together, and they all roll up to the final overall goal.

Q And specifically, what does the Nuke Weapons Center here at Hill Air Force Base do as it pertains to these missiles that we're talking about?

A We repair them; we store them; we buy parts if needed. And we have them available to go out in the field when needed to be put in -- we call it a hole -- into the hole so that the missile is on alert. So we sustain that. And our job is to make sure that we have 400 missiles on alert at all times.

Q So is it fair to say that you're an organization of

Deleted: 24¶

maintenance and support of these methods?

A We aren't personally maintenance. We -- we sustain it. So we make sure all the parts are available to repair it. We send it to another organization, using technical orders. We do all the technical orders. We have to make sure that they're correct.

But we sustain it by making sure parts are available; these parts are bought if we need it; make sure they're transported correctly if needed; that we have enough in supply to provide to the field when they need it to -- or anything that they need. So we -- we support it through its life cycle to make sure that -- that they're ready and available to use if the president ever decides he needs to use them.

Q I heard you reference shops or a shop. Can you explain what shops you're referring to that are located here at Hill Air Force Base?

A Yes. So we have multiple maintenance shops here at the base. Some are for -- for F-35 (audio interference) like what we work on. Other weapon systems, they repair those things for us. There's multiple shops. They have a table shop. We have a shop that works on the (audio interference) we talked about. We deal with mostly three of those shops, but there's multiple for other cases once in a while, a different shop if you need to.

Q So in these shops, is that where there's actual hands on

Deleted: 25¶

Deleted: 26¶

working on the assets that you're talking about?
A Yes. They repair those there. Some of them are repaired out in the field where they're located. There can be some repairs done out there. They also have to have technical orders for those. So any kind of touch, no matter where at -- where it's at, they have to follow up for testing as well as (audio interference).
Q And so let's come back full circle to Mr. Zuech's job as an equipment specialist. What does the equipment specialist's job do relative to what you've just described?
A So they have to make sure that any -- if the -- if the shop or the technician has returned something and something isn't correct in the -- in the technical order, they can request the change to have it updated.

If a new procedure comes in, that has to be verified by going to the shop and running through that procedure. But before you can do that, they have to be written in the technical orders. The change has to be implemented into the technical orders.

And some of them are minor. Maybe it's a word that doesn't make sense, and some of them are major changes. If something has to, the process has to change, then that's a -- that's a pretty major change that the equipment specialist would be part of going to the shop and going through those changes to make sure they actually work correctly, make sure

that the technicians can interpret them correctly and can follow them.

They will redline, they call it, different things. And then, once it's -- once it's determined that those are correct, the ES will go through the process of getting them printed in the technical orders so they can go out to everybody that would touch that particular asset or that process.

Q Now, is access to classified materials and classified areas required to do that job?

A Depending on the workload, yes.

Q But is that required of an ES to have that access in order to hold that position?

A Yes. If their workload requires that (audio interference).

Q That was my next question. Did Mr. Zuech require access?

A Yes. He did have some classified (audio interference).

Q Is access to the installation here at Hill Air Force Base required to do Mr. Zuech's job?

A Yes. He was -- there are times like when I talked about going to the shop to verify our procedures, he would have to do that in person. He would have to do anything that's classified on book in person. Sometimes we have -- we also deal with supply here. So we have storage areas that house our -- our assets until we need them. Sometimes we have to go up to there and visibly look at them, and an ES is usually required to make

Deleted: 27¶

sure that they can look at them and say that the configuration of them are correct. So if it comes to that, you would have to be on site to do that.

Q I think I heard you say that you were Mr. Zuech's first-line supervisor at some point during the last two years.

A Yes.

Q But you were a coworker with him prior to that?

A Yes.

Q Before Mr. Zuech's removal, who -- who were his supervisors? What was his chain of command? If you can outline that, a couple of layers, please.

A I believe Tim Green was his supervisor from the time he came to our organization until he left. We have the supervisor above Tim would be the branch chief. We had several here and there that weren't there very long. I can't even remember completely some of their names, but Tim Green also did a dual role for quite a while with branch (audio interference) supervisor (audio interference) position.

Q At the time of Mr. Zuech's removal, who was his first-line?

A I was.

Q And who was his second-line supervisor?

A Thomas Huber.

Q And who was his third-line supervisor?

A Aimee Tarbet.

Deleted: 28¶

Deleted: 29¶

Q And what's Aimee Tarbet's title?
JUDGE BROOKS: Wait, wait, wait. Okay. Aimee Tarbet was the third. Who was the second?
THE WITNESS: Thomas Huber.
MR. SMITH: Are we okay?
JUDGE BROOKS: Yes, we are okay now.
MR. SMITH: Thank you.
BY MR. SMITH:
Q As a first-line supervisor, what was your responsibility regarding your subordinate employees' leave requests?
A I would be responsible for approving them or denying them and also verifying that when they put their time into our timekeeping system, that it -- it was correct with the lead that they -- that they used.
Q If you would please, explain to us in general terms the leave request system that you employed as the first-line supervisor.
A Our system is called a TAP. I can't tell you what that stands for, but that's the system that we use to (audio interference). Employees can go into that system and request leave. It can be approved or denied in that system, and then they input their time for the two weeks in that system also. And it will flag if they put in leave if they don't have a leave request approved. Or -- or if they've gotten a leave request approved and didn't put it in, it would also flag

(audio interference).

The employee would then concur on their timecard they had everything correct. And after that, the supervisor, so me in this case, would go in and concur. We would certify, sorry, we would certify that we are saying this is correct.

Q What types of leave are available to your employees?

A So have annual leave that is accrued. You can accrue four, six, or eight hours every pay period, depending on the length of your service. Everybody gets four hours of sick leave every two weeks. There's award leave that you can -- you can get for appraisals. There's comp time if you happen to work over your 80 hours. You can get overtime in certain situations. You can have travel comp. So if you go TDY, or work-related trip and you travel more than your eight hours, or you travel on Saturdays, you use those hours as comp time so you can use those later for leave.

And there's -- there's (audio interference) leave that you can take for going to the gym. You get three hours a week that you can use to go to the gym (audio interference). And I'm sure there's other kinds of leave that happens not very often. Holiday leave if you work a holiday (audio interference). I've never had anybody do that, but.

Q And I assume there's some form of sick leave as well?

A Yes.

Q Have you ever dealt with a situation of paid parental

Deleted: 30¶

leave prior to Mr. Zuech?
A No, sir.
Q Was there a system of coordinating leave requests and a reason for why they came to you for approval?
A For -- for paid parental leave?
Q Any kind of leave.
Q Yes. We have -- there's lots of ways to do that. But at the beginning of the year, we have a projected leave forms that we use for employees to put what they project they're going to use for the year. It's discussed between the supervisor and the employees. And when that is agreed upon it, they both sign it, it goes into their employee file. So that gives the supervisor kind of an idea of who is going to be gone at what time for planning purposes. And when somebody is gone, especially for a long period of time, their workload has to be covered. So we use that. And particularly around the holidays, a lot of people take leave on holidays, we still have to have some coverage.
So all of that is taken into consideration so that we can plan out the year and (audio interference) in their file so we can reference it if we need to.
Q Why do you coordinate or anticipate or try to work through this at the beginning of the year? Help me understand that.
A Mostly to plan, to plan out. There's a couple of reasons that we do that. It -- so that the employee has -- and the

Deleted: 31¶

Deleted: 32¶

supervisor has in writing what they agreed upon or leave -- it doesn't mean you can't vary from that. Obviously, people get sick or something changes that they don't end up taking the leave or (audio interference).

But it's mostly to help you plan out the year to make sure we have -- not all of our ESs are gone, and not all of our program managers are gone. Not all engineers are gone so that we are able to cover anything that comes up. Being in the Nuke Weapons Center, we have counselors that are assigned to us. A lot of them are things that we have to answer to our colonel. Sometimes we have to answer them for Congress. Or maybe it just depends on what it is, and we do have to be able to have coverage. We just can't have everybody gone (audio interference).

Q And when you speak of coverage, what is the impact on the workload if employees are taking leave at the same time?

A Well, if -- if, say, it was all equipment specialists and we needed somebody to go to the shop and walk through some processes, we would -- we wouldn't be able to do that. So if there's something that comes up that we have to provide how many more missiles we could provide assets for, there's got to be some program managers that can go in to our classified vaults that we have to look up, a lot of those numbers are classified.

So we -- if we need somebody that has -- we call it a SIPR

Deleted: 33¶

token. It's kind of like a CAC card or a access card that we have for classified things. So we have to have somebody that has one of those that can go into the vault and look up classified numbers.

Q And you mentioned at the beginning of the year you have this projected leave. Is that regarding annual leave requests?

A Regard -- yes. Annual leave, paid parental leave if they're having that. It's even sick leave if they know they're having surgery on a certain day in three months, they can put that on there. So anything that they know about that they can forecast. Obviously, if somebody wakes up sick one day, that's unscheduled. It's nothing.

Q Does that assist you as a supervisor, forecast your ability to accomplish your mission and accomplish your work?

A Yeah.

Q How so?

A Well, like I said, to make sure things are covered. To be able to let employees also have their time off. If -- if there's, like, if there was going to be multiple people off at the same time, we may even have to negotiate some of that. We would go after how long (audio interference ) or how long they've been there, if they had an issue and had to do it that way.

Also, it's a chance to have an understanding with employees that there's going to be a lot of people off at this

time. I will approve it, however, if something comes up that we need to go into a classified area and if it's your workload, you may have to do stay and do that. And usually, people understand that and agree to that.

So I do the best I can to let everybody have the leave that they want. But we do have to consider the workload. Normally I don't have to deny that. Usually, employees are very good at helping to work that out.

Q What is the significance of accuracy as it pertains to leave requests?

A If it's something that they've requested a Friday off, you know, that's pretty easy if they decide not to take it, or even if they didn't know something was coming up and they wanted to take those day off. If it's an extended period of time that somebody is going to be gone for a long time and it needs to be as accurate as it can be, and there are circumstances, understandably. But if somebody is going to be gone a long time, say, for paid parental leave, then we have to plan on how to cover that work.

Q Would if affect payroll as well? Would the leave request be accurate in the system?

A The leave request in the system once you make it has to be accurate. Now, negotiating when you're going to be on leave, maybe there's some leeway. But once you take leave or don't take leave if you've already asked for (audio interference).

Deleted: 34¶

Deleted: 35¶

Q When do you conduct this annual projected leave exercise with your employees?
A We start talking about it in January. I believe it's due sometime in February.
Q Of each calendar year?
A Yes.
Q And were you Mr. Zuech's supervisor in January, February 2022?
A Yes, I was.
Q Did you engage with him in that exercise, projecting his leave?
A Yes, I did.
Q Tell us what happened as you worked with Mr. Zuech in early 2022 to project his leave.
A He brought his projected leave in to me. He had on there twelve weeks of paid parental leave and his annual leave projected out. He let me know that obviously his wife was having a baby and that he was letting me know that out of courtesy. However, it's not -- not a courtesy. I have to fill out the paperwork and help them get that done and approve all that leave. So I have to know it's not just -- just the courtesy of something; he would have to let me know.
He had that on there. He had his projected leave on -- his other annual leave on there. He had -- for paid parental leave, an employee gets 480 hours, which is twelve weeks. He

Deleted: 36¶

had that on there. So he would be back to work for four days and then -- at the end of September, and then take the first half of the month of October off (audio interference) November and December.

I let him know that I -- only being back four days was not long enough for being gone for three months to really get back into his workload. You have to log in to your systems every 30 days, or you lose them. The process to getting them back is filling out paperwork and several people's time going through the system. You won't even have access to a system back in four days.

Now, maybe one would come through, but he wasn't even going to be able to start working in four days, much less get through three months' worth of email, trying to figure out where he was at with his workload, with the people that had been covering for him. And I let him know that being gone another two and a half weeks after only being back four days, that it wasn't okay, that he needed -- they needed to look at his annual leave and see if he could -- what he can do about that.

So maybe come back to work for a little while, get back into the system, get back into the rhythm of his workload and through email and do something with it to help with that.

Q As you worked with him at the beginning of 2022 on this projected leave that he presented to you, was that the first

Deleted: 37¶

time you learned that he his wife was expecting a baby?
A Yes, sir.
Q Did he tell you a time frame when the baby might be due?
A Yeah. He put that on the projected leave. I believe it was July 8th, somewhere in there was -- it was within the first week of July or the end of the first week of July.
Q He proposed that that's when he would start his paid parental leave?
A Yeah.
Q And he proposed -- how did he propose to take that paid parental leave consecutively or intermittently?
A He put down three months consecutively at that time.
Q And -- and so as I understand it, your concern was that after his 12 weeks of paid parental leave, he was only going to be back a few days before then again taking leave, but this time annually. Is that right?
A Yes, sir.
Q So what was his projected return to work for those few days?
A I would have to look at a calendar. He would -- he would have been back with the very last week of September, I believe it was. And it would only be four days because his regular day off, Friday, would have been that week. So that was why it wasn't working (audio interference).
Q As you engaged with Mr. Zuech about projecting this these

leave requests, were you able to determine what it was that was driving his request or the basis or reasons for his request, the way he presented them?

A The annual leave in October was for a hunting trip that he takes every year. So the paid parental leave was -- was just to be off until then, which was his right to do. And then -- and then the hunting trip, so which actually was the start of -- the issues that came up was about hunting.

Q What do you mean, the issues? What -- what did hunting have to do with that?

A Well, to move his annual leave so that he was back for more than four days would have run into the hunting trip that he takes every year.

Q Okay. So if he projects -- he's engaging with you about this projected leave at the beginning of 2022, I take it you raised some concerns, as you just mentioned. Is that right?

A I did about him not being back to work for a while before he took more annual leave.

Q So what happened next?

A He -- he took the form back, and he came back. I don't remember how long after, if it was a few days, but I don't remember exactly the timeline. He came back with a new projected leave. He said rather than use his annual, he would rather come back three weeks early from paid parental leave and use those later and have a year to use all of his parental

Deleted: 38¶

Deleted: 39¶

leave.

So he had, which would have been nine weeks consecutively, had a return date of September 6th, I believe it was, which would have him back for almost a month before he took the first half of, I believe it was, the 18th or so of -- early (audio interference) of October. And so (audio interference).

Q So in other words, was he breaking up the paid parental leave?

A Yes, nine weeks consecutively, and then he didn't -- he had mentioned he would take the rest of the parental leave after the first of the year, because he already had regular annual leave scheduled out through the rest. So he had until next June to take the rest of the PPL, or the paid parental leave, and stated he would just do that after (audio interference).

Q Whose idea was it to propose this alternate projected leave?

A It was TJ's idea.

Q After you raised some concerns?

JUDGE BROOKS: Did you say it was him? It wasn't totally audible there.

THE WITNESS: Yes. TJ came back with -- with alternates -- projected leave.

BY MR. SMITH:

Q And so with this alternate projected leave now before you,

what happened next?
A So we both agreed on that. We both signed it. I put it in his employee file. I sent him an email after I had talked with him at my desk. After he left, I sent him an email to clarify that I did not ask him to move his paid parental leave, but that I did appreciate him taking his workload into consideration.
Q But he didn't adjust the annual leave request; that stayed the same?
A It stayed the same on the projected leave form. Later on, closer to when his baby was going to be born -- baby was born in (audio interference) filled out this new timeframe, I started hearing some other employees that were his coworkers that he was saying he was going to be gone for four straight months and not going to be back until the 1st of November, that he'd be gone three months on PTL and made the statement that he would be gone a month, the whole month of October hunting.
Q TJ told you that or where -- how did you learn that?
A So other employees told me that he had said that. But then, I called him into the office. And around this time, we were starting to try and get his paid parental leave paperwork done. He -- he brought in with him the leave request that -- you have to fill out a leave request stating the date you think you're going to start your PPL, the due date.
If you're taking it consecutively or intermittently, your

Deleted: 40¶

return date. And then it has an actual -- the day he was actually born, a week or so earlier than what the due date was that he put on there. He brought that in, and it said he wasn't coming back to the 1st of November. I said, TJ, this isn't what we talked about. And we had never talked about you taking the whole month of October off.

And then that I had been hearing from coworkers that he was doing that, and he said that, yes, it was pretty funny to see their faces when he told them he was going to be gone for four months straight. So I told him that this wasn't what we agreed upon. I would not approve a whole month of annual leave after he had already been gone for three.

Q When did that conversation happen?

A It was sometime in June. We were starting to get paperwork, trying to get paperwork done, I believe, for his paid parental leave. And this was one of the pieces of paper that he brought in to say that he would be gone. The return date wasn't until the 1st of December. I gave that back to him and said, this isn't what we agreed upon, that he needed to pick up the paper and do the schedule that we had agreed upon the first week.

Q Well, what happened next?

A We -- we started getting paperwork done about a week or so -- about a week before his wife was due. He asked if he could telework half days and use sick leave for the other half

Deleted: 41¶

Deleted: 42¶

to help her. They had a toddler, and then she was -- she was almost full term. And I said, yes, of course that -- that's fine. We can do that. I have -- I have four boys myself. I understand how hard it is to deal with that. I was perfectly okay with him using half a day of sick leave and staying home. So he was teleworking and staying home. And then (audio interference).

Q So a combination of telework and sick leave. Is that what I heard you say?

A Yeah.

Q And when approximately was that?

A That was, I believe, started the week that he actually had the baby, on the 29th. So I think around the 26, 27. At that time, they weren't expecting her to go early, but he wanted to be home for the last week would have been actually about two weeks before the due date.

Q Are we talking the end of June 2022?

A Yes, sir. So he was -- I was trying to get paperwork done for him. He -- he couldn't get things to download. He got some paperwork filled out by the doctors. He took pictures of it. His name was in the place his wife's should be. Hers was in the place his should be.

I asked -- I checked in to make sure I could accept pictures, and if I have to send them to the people that are overpaid parental leave, they have to have that paperwork.

Employment relations also wanted to have the paperwork. They wanted to make sure pictures could be used.

And so I was trying to find all of that out. It got (audio interference) on the 29th when the baby was born. He was working half the day. We were texting some back and forth. He was trying to -- he sent me a new form that I talk about that showed when he was going to come back. It stated on there that he was coming -- would return on September 6th, I believe it was, that he was going to implement and wait and review that (audio interference). His explanation was that he wanted to take it continuously, but his supervisor, Lori Masero, wouldn't let him take it continuously.

I let him know that I -- that that is not what happens to you. I wouldn't accept that because I -- that is not what has happened. If he wanted to take all three months, that he could do that, but he needed to decide. He had come back with a plan to take it -- just the first nine weeks consecutively. So he did eventually turn that -- turn that back in correctly.

Q What became of that request, that modified request?

A So I expected that he would return on the date that he said as things started. Even -- even though he says he wanted it all consecutively, he did have nine weeks he could have used consecutively according to what he came up with. But he started off with -- he didn't want to start with PPL on the day his baby was born. He wanted to leave his sick leave, so he

Deleted: 43¶

didn't (audio interference) consecutively.

Q Was that consistent with your arrangement with Mr. Zuech?

A No, no. The arrangement was you could take parental leave, it could and would start on the day his baby -- he didn't want it to start for another week, which would have more coincided with the date that she was actually due. I think she was due, like, two days into after he started the PPL, two days into it. I believe it was a Wednesday. He wanted sick leave again for nine hours.

So nothing was consistent. Nothing went according to what we had agreed upon. He took a -- he took well over 350 hours of sick leave between the time the baby was born and the end of the year. Like, 177 hours of annual leave at that -- during that same period. So he didn't take it consecutively.

Q So when was his last day in a work duty status?

A It would have been the 29th of June '22. He had four hours of regular work time that he was working.

Q And so what -- what status was he in from that point forward, going forward?

A He was in leave status. He was in sick leave, annual leave, paid parental leave, all of those, but never consecutively paid parental.

Q It sounds like there were multiple changes, then, to the leave request going forward?

A There were multiple changes. At some point, and I can't

Deleted: 44¶

Deleted: 45¶

remember the exact date, but he didn't return on September 6th as agreed upon. He would not give a return to work date at all. At some point in there, he told me that he was just -- he was just going to go ahead and take the rest of it consecutively instead of using it, you know, later in the year, like next -- beginning of the next year.

And I said, okay. He said that verbally to me. And then I believe (audio interference). I sent him an email then stating just to go on record to clarify you have decided to take the rest of your PPL. So I don't know if he wanted it consecutively or (audio interference) being honest with you, he said consecutively, but he also asked me for the rest that said I could dictate that he had to take it consecutively. So it was very confusing. It was back and forth all the time. We asked for multiple -- specifically for doctor -- nine-hour doctor appointments, different things. Asked for annual leave for a birthday party, all kinds of different things.

It was never -- and then, he was denied the annual leave for the birthday party. Yeah. Thomas Huber denied that. He asked for him to fill out a form stating why he denied it and came in to bring that form in. It was -- it was blank, and Huber said he wouldn't fill out a blank. And he had to fill out the date and what he was asking. He marked on there that it was for medical, although the text has said for a birthday party. So it was it -- nothing ever was the same from, you

know, from one day to the next. It would be different.

Q Leave -- subsequent leave requests and a variety of them, it sounds like. Are we talking all after the birth of his baby?

A Yeah.

Q And were they all directed to you or Mr. Huber or both?

A They were directed to me, as his first-line supervisor after a statement he made to the lady before me. We did receive (audio interference) for safety reasons. And (audio interference).

Q So did you ever deny request for paid parental leave?

A No, I did not.

Q Did you ever deny request for annual leave?

A Yes.

Q Could you tell us when and why?

A The birthday party was denied. That was actually from Mr. Huber from (audio interference) I was out of town. After -- after all the sick leave was used, most of the paid parental leave, all his -- we have (audio interference) leave, we call it, depending on (audio interference), they have to use it before the end of the year; he had used that. He had used some award leave that he had.

After those things were started to be used up, then I started my annual leave, letting me know he needed to come in for -- for workload requirements needed to do with work. He

Deleted: 46

still didn't come in. He did go on -- go AWOL after the first of the year for a while.

Q The baby -- remind me again when was the baby born?

A June 29th, '22.

Q Did he return to work at any point after June, the end of June 2022?

A No, he did not.

Q Did he -- did he return to work on the 6th of September, as you originally anticipated?

A No, he did not. We -- I did inform him, informed him later in the year. I believe it was in December. Paid parental leave is fairly new. There's not a lot of, you know, usually when something's a little older, the bugs are worked out of it. There's not a lot of (audio interference), but I did find out that if the -- the agreement that was made is changed, then the employee needs to fill out a new agreement.

So I did let him know because it had changed, that he needed to fill out a new agreement that that scheduled out the rest of the paid parental leave, which intermittently they are supposed to give you somewhat of a schedule of how they're going to use it. He did finally send me a form that he said was updated. So it was the exact same form.

The only update made was at the bottom. He added "updated" and the date and said leave November 1st or something like that. It still had the return to work date of September

Deleted: 47¶

Deleted: 48¶

6th, which was long gone. So he hadn't updated (audio interference) PPL, paid parental leave. So the form wasn't any different. So --

Q So let me draw your attention to September of 2022. I think I heard you say you didn't return on the 6th of September. Did you ever see him face to face again during the month of September 2022?

A Yes, I did. The 26th of September was a Monday. He had a Step 1 grievance scheduled for Monday which supervisors do not go to. He -- he had put in multiple grievances -- 15, 16 by last count; I don't know how many. But he did not make very many of those step one grievances that are set up with the union and employee relations to work out and to talk about the grievance. He moved them continuously.

He would postpone them, say he wasn't available. He had a Step 1 grievance that Monday that had been moved I know for at least four times different days. Normally he pushed them out. This one was -- was on the third time it was rescheduled, was scheduled for Wednesday. There were two set, one scheduled for Wednesday. He asked to move that to Monday, which was, like I said, he never asked to do one early. He was always pushing them out.

Q Now, when you say Monday, do you mean the 26th of September?

A The 26th. So we asked for to meet with him before that

Step 1 meeting to kind of have a managers management meeting with him to talk about returning to work, to get a return to work date from him because he hadn't come back to work. In that meeting, he -- the meeting I thought was about him returning to work, the meeting turned into basically annual leave for hunting.

He wanted -- he was on paid parental leave at this point, approved paid parental leave for the rest of the week. He was on annual leave still for the first part of October, but because he had rejected that (audio interference), so he still had that leave for the first half of October. He was on paid parental leave that last week of September. He wanted to -- he wanted me to approve annual leave for the next three days, which would have been 27th, 28th, and 29th, so Tuesday, Wednesday, and Thursday. Friday was his day off. And his statement was, when you fill out your projected leave at the beginning of the year, you don't always know what tag you're going to draw.

Q Does the word "tag" have any meaning for you?

A Yes. He was talking about a tag for hunting. So --

JUDGE BROOKS: I didn't get that -- tag?

THE WITNESS: A tag for hunting, like a deer tag, an elk tag. So you put in for tags during the year, and you get -- if you get a tag. So the statement was when he filled out his -- at the beginning of the year, you don't always know

Deleted: 49¶

Deleted: 50¶

what tag you're going to draw. So he wanted those next three days off to go hunting (audio interference) because of the tags they had drawn.

BY MR. SMITH:

Q And just for clarification, he was requesting annual leave, for which days again?

A 27th, 28th, and 29th.

Q Of September?

A Yes.

Q And so what did you do with that request?

A I did not approve annually for that. It wasn't suggested. He hadn't come back to work. He needed to come back to work. I let him know he was -- if he wasn't going to be taking his paid parental leave, he needed to come to work. So I -- I did not approve those three days. But he was still on paid parental leave. That was already approved for. However, he did say to me that if I would approve those days, he would drop the grievance that he had.

Tabitha Payne, who was actually the employee relation or the labor relations person at that time, we all just kind of stared at him for a minute, and she finally said to him, I don't like -- I don't think I like that tone. And honestly, I can't remember his response because I was still shocked that I kind of felt like he was trying to blackmail me, you know? I'll drop you -- I won't grieve this. I'll drop it if you'll

Deleted: 51¶

give me my leave I want, approve the annual leave.

I did finally make the statement to him, so this isn't about your son. This is about hunting. And he just stopped and looked at me and kind of smiled and went back to looking for his papers, didn't respond.

MR. SMITH: I'm going to draw everyone's attention to tab 14 again of the initial appeal file, specifically page 166. Correction. Let's go to page -- I'm sorry. I'm trying to find the right page number. Page 170. Page 170 of tab 14. I pulled that up in front of Ms. Masero. And if I can ask some questions about that, please.

JUDGE BROOKS: Is this a time history?

MR. SMITH: Pardon?

JUDGE BROOKS: Is this a master time history?

MR. SMITH: Yes, yes. Sorry, Judge. I couldn't hear you.

JUDGE BROOKS: Thank you. Go ahead.

BY MR. SMITH:

Q Ms. Masero, are you looking at page 170 of tab 14?

A Yes, sir.

Q And do you recognize that?

A Yes, sir, I do.

Q Can you tell us what it is?

A That is the record of TJ's time, which days he took, how many hours, or it's a record of whether he'd had regular time

Deleted: 52¶

if you were at work, annual --
Q Does it includes dates and codes?
A Yes, it does.
Q And are you able to identify the date of September 27th, 28th, and 29th of the year 2022 on that page?
A Yes, sir.
Q And is there a code associated with those dates?
A Yes, sir. So there's a code LN, which is a leave code. I can't tell you what the word stands for, but it is a leave code. And then the sub code for that leave, is DG, which is for paid parental leave.
Q So DG is over in the next column by nine. So what is -- what does nine mean?
A Nine hours of paid parental leave was paid for those nine hours of paid parental leave.
Q Okay. And the Code DG means paid parental leave?
A (No audible response)

JUDGE BROOKS: Was there an answer to that, DG means paid parental leave?

THE WITNESS: Yes, sir it is.

JUDGE BROOKS: Thank you.

BY MR. SMITH:
Q Well, following the 26th of September meeting, what happened next?
A So after the meeting, he sent me an email officially

Deleted: 53¶

requesting annual leave for those three days. I -- I replied to him that it was not approved, and it was denied, and he said okay. Although I didn't deny it, he still canceled the other Step 2 meetings that would have happened on Wednesday the 28th. And I believe that if he had kept that date, he would have had to explain why he couldn't be to it, because I believe he wasn't (audio interference).

JUDGE BROOKS: Sorry. He would have to explain what because you believed what?

THE WITNESS: He had a Step 1 grievance, another one scheduled for the 28th. He had two; he moved one to the 25th. He went ahead and canceled the one on the 28th. He had made the statement, if I would approve annual leave, he would drop that grievance on the 28th. I didn't approve it, and he still dropped it. And I believe that is because he was hunting and would not be able to make the meeting.

BY MR. SMITH:

Q So in other words, there was a meeting for Mr. Zuech on the 28th of September that was canceled?

A Yes, by him, although he stated he wanted me to approve that leave in order to cancel it, and I didn't approve the leave, and he still canceled it. So he cleared two meetings off of the 28th.

Q But he -- did Mr. Zuech take his annual leave in October as forecasted?

Deleted: 54¶

A Yes. It was for the first half of October. It started on the 3rd, as you can see on that paper. The LA is for annual leave.

Q The same document, page 170. How did Mr. Zuech's absence from the workplace impact workforce and workload?

A He had -- his coworkers had to cover that. We had two brand new equipment specialists. One equipment specialist and one lead equipment specialist that had came in just a few weeks before him. I think that the lead maybe even came in right after him, so brand new. They had to cover his workload. I had asked him to work up a document before he left to give to them that showed them what tech orders he was working on. They all have a number. Where he was at with changes, where his workload was at so that they could find them in the system and continue to work on them. He didn't do that.

A lot of the ways they found out something was due because somebody started calling saying, hey, these were due, and they're not done. And that's how they found out basically where his workload was at. We also have some things that had to be redone. We'd do some testing. That is called service star testing. Besides the -- the tests that we do every year where they actually put a missile in the air, they do that two or three times a year. Here at Hill Air Force Base, we have a testing facility that takes those reentry vehicles that we have, sends them, does all kinds of tests to simulate flight so

Deleted: 55¶

that they can -- can get data off of that to give us confidence that our assets are working. He had worked on some things for that, but nobody could find where he had put any of the information.

The engineer that had to go over and talk to the technicians that TJ had worked with were the ones that told him, we've already done all this with TJ; it should be all recorded and done. You should have all the information, couldn't be found anywhere. Because, again, he didn't leave anything for anybody, and it had to be redone. These tests are tests that are congressionally mandated that we do. They're very important to the confidence of our weapons system that protect our country. And it had to be to be redone.

The -- the technician that was working on that, the -- told the engineer that TJ had not been very engaged, and he was more concerned about his business that he had. So it hadn't been really great work to begin with when they were doing it. So but anyway, we had to go back and redo that, but that -- that set them back for a few days. Luckily, it didn't set us back for a month, but it did set us back. But the classified technical orders that he should have been working on had to be finished by a lead ES that's not even in our department anymore. He used to be, but he finished those up for us. Spencer Butler was his name. He got those finished.

So a lot of stress on the new ESs. We had some program

managers that were trying to learn how to go into systems and look up part numbers and things that the ES would normally do just to help the ESs that were still there out because they were still behind.

So there was a lot of stress that caused a lot of extra work for other people. They were happy to do that through the birth of his son. They weren't so happy to continue to have to do that when he didn't come back to work.

Q Thank you. If I can draw your attention back to page 170 and tab 14. You've already explained what that is, but who's responsible for inputting the time in these attendance records?

A So the employee is responsible for putting those in and concurring them. And the supervisor is responsible for certifying that they're correct.

Q And on page 170, does it indicate which employee input this information?

A Yes. TJ Zuech.

JUDGE BROOKS: Did you say TJ did?

THE WITNESS: Yes, sir.

JUDGE BROOKS: Okay.

BY MR. SMITH:

Q Lori, if I can -- sorry, go ahead.

A I do want to clarify that if something is input wrong, accidentally or on purpose, I can have the timekeeper that's over this go in and fix it, which was the case on the 26th for

Deleted: 56¶

Deleted: 57

the four hours and minus three. He had put in -- input too many hours for that for regular time for something he had done that day at the Union. It has six hours in there. And I did have that fixed. But that would show up when we needed to have it done. As you can see, I believe the date with the ADJ under the adjusted date.

Q Did Mr. Zuech ever adjust or attempt to correct the input for the 27th, 28th, 29th of September?

A He -- he can't adjust it once it's certified. It would have to be adjusted by the (audio interference).

Q But to you knowledge, did he ever attempt to change that and code it differently than the way it's coded on the timecard?

A No, sir. He would have had to go through me. He didn't ask me to do that.

Q If I can now draw your attention, Lori, to a different topic. Are you aware of a statement Mr. Zuech made at the union hall at Hill Air Force Base in early February 2023?

A Yes, sir, I am.

Q And when did you become aware of that, if you know?

A I believe it was in March at some time that I first became aware of that. It was a Friday, and I don't remember the exact day date it was, but I know it was on Friday when I became aware of it.

Q And to your understanding, what was the statement Mr.

Zuech had made?
A That he had dreamed of killing his supervisor.
Q And were you his first-line supervisor?
A Yes, sir, I was.
Q How did that statement impact you?
A Well, for -- to begin with, with work, it was a late Friday afternoon. Security contacted me, told me not to come in on Monday until they could have us access to the base counsel until they found out more.

The security officer said because it was so late on Friday and that's how I remember it was a Friday, that most of the security forces, the people that can do that, were already gone home, and he was at home. He called me back a little while later and said he was going to actually go up there to the base and talk to somebody in the office. Somebody had to be in there.

Called me back a little while later and said that they had actually gotten his access to the base extended and that I could go ahead and come in on Monday.
Q You mean Mr. Zuech's access to the base?
A Yes. And that I can go ahead and come in to work on Monday, to be careful, how was I doing, was I okay. I let him know I had a security system to make sure I turn that on and to be careful and to know my surroundings and things like that.

It impacted, you know, at home, of course. Made me a

Deleted: 58¶

little bit nervous, but made sure I had my security system on, things like that. It impacted work. Our colonel, Col. Storms, locked the building down and has not -- has not raised that since then. Our building is still locked down. He hasn't revoked that yet. It's still locked down.

I had employees -- there was an email that was sent out to our whole building stating that it had been locked down and why. I -- and -- and they said that it had been directed -- -I believe they said it had been directed to RS/RV, which was us, the reentry system, reentry vehicle branch.

I had some employees that were very concerned. One in particular sent an email out asking if that was TJ. And that that person felt like they needed to know that for sure who it was, and it would be irresponsible for us not to tell them, which I -- which I understand that. I had another employee that said the same thing because he said if I had -- if TJ had called and said, hey, I need to get something off my desk, I don't have my CAC card, could you come get me, that he would have more than done that and helped him if he had not known that he was not -- that he was suspended from access.

The same employee that was mostly concerned, we had asked another branch chief, who was on the same level as Mr. Huber, to send out some questions to our people before this happened, asking some questions about statements that TJ had made about being harassed, about not wanting to be around the stress of

Deleted: 59¶

his coworkers, about the way he treated. So we sent questions out through another branch chief about that, and they asked some questions. And this employee came to me and said -- and said, I will not write down what I would have written down. And so he told me --

JUDGE BROOKS: Sorry. Can you repeat what the employee said?

A That he would not write down -- that he would not write down what he was going to before he found out about the statement and before that email was sent out by security, because TJ would know who said it, and he didn't want TJ to know that he had said anything because of the statements he made. And that was that on telework, he needed him to go to the supply warehouse to look at an asset because he was equipment specialist, and he showed up covered in grease, which he had a business fixing diesel motors.

He should have been teleworking for work, but he was covered in grease, and this employee suspected he'd been working on trucks instead of his -- his Hill Air Force Base work. He did not want to say that in his reply because he was worried about TJ knowing that and retaliating. So it scared some of the employees also.

BY MR. SMITH:

Q Did Mr. Zuech's position require a security clearance?

A Yes, it did.

Deleted: 60¶

Deleted: 61¶

Q Did it require him to have access to classified materials and classified locations?
A Yes, it did.
Q Could Mr. Zuech's position be done -- his job be done without a security clearance?
A Not completely. There were some aspects he could do without a security clearance, however, as far as the security clearance goes to access it. However, his position, the equipment specialist position, required him to have a security clearance.
Q Was Mr. Zuech's security clearance suspended?
A Yes, it was.
Q Because of the statement at the union hall?
A Yes, because of the statement. Because of several things that trigger things that need to be reported. He had stated in some of his paperwork for different things, that he was having issues at home. It said somewhere at some time about financial things. All of those are red flags to having access to classified.
Q Did Mr. Zuech's position require him to have access to the installation at Hill Air Force Base?
A Yes, it did.
Q Could Mr. Zuech's job be done without access to the installation at Hill Air Force Base?
A Not -- no, not completely. But whether he could still do

Deleted: 62¶

other things that aren't classified, his position has to have a security clearance, whether he's actually working on it. Even though he doesn't work on classified all the time, his position -- he has have a security clearance to hold that position.

Q And the same with access to the installation?

A As far as a security clearance? Well, he has to have one that's not suspended to get on to the facility. You don't have to have a security clearance to get on to the facility. There are plenty of people, spouses that live on base, so you don't have to have it to get on. But if it's suspended, you cannot get on.

Q I guess let me ask the question this way. Could Mr. Zuech's job be done or accomplished without him having access to Hill Air Force Base?

A No. It could not.

Q Was Mr. Zuech barred from Hill Air Force Base?

A Yes, he was.

Q By the installation commander?

A Yes.

Q Are you aware of any deficiencies in the process of how that barment came about?

A No, I am not.

Q Why is barment and suspension of access so important in your line of work?

A Well, we do have to be able to come on to the base. We have to have -- because we are the Nuke Weapons Center, we do a lot of classified business. We have to answer a lot of classified CASPERS come to Congress to -- our -- our general, to our -- our colonel, all -- all kinds of different organizations way above us. And so we have to be able to access classified information to send those up.

Q I'm going to draw your attention to another topic. As a supervisor, what are your roles and responsibilities with respect to one of your employee's requests for accommodation? What's -- what's your responsibility in that regard?

A I would provide them paperwork, which is just a fact-gathering paperwork. I don't believe that that's any official paperwork. It's just paperwork you can use to gather up information to start that process. You have an ongoing dialogue with the employee and help them get that worked out. Once there is -- it has been determined that there is a medical reason for them to have reasonable accommodations, then you work together to figure out what those accommodations will be.

Q Is there anyone else in the Air Force, or at this installation, that you rely upon to help give you advice in determining what an appropriate accommodation might be?

A Yes. So occupational medicine would help with that. They would help to determine the -- if it is a true medical need to have those. We also have an organization that helps with

Deleted: 63¶

Deleted: 64¶

processing the paperwork and helps determining all of that.
Q But ultimately, who makes the decision -- determination about an accommodation?
A The supervisor makes the determination about the accommodation. The supervisor would make the medical determination. But once that was made, the supervisor would make the determination on what can and can't be provided for the reasonable accommodation.
Q Did you ever receive a request for accommodation from Mr. Zuech?
A I actually sent him the paperwork because of all the medical appointments, the doctor notes saying he could work for six weeks, things like that. I -- I sent him the paperwork.
Q So you initiated the process?
A Yes, sir.
Q And -- and when did that happen? When did you send him this paperwork?
A I can't remember the exact date. I think it was after the first of the year, but there was so much going on all the time. It's -- it's all running together, but I believe it was the first of the year.
Q And by the first of the year, do you mean the first of 2023?
A Yes, sir, 2023.
Q So you sent him paperwork. Then what happened?

A He still fills it out, fills some of it out. I coordinated with occupational medicine and with Mr. -- I believe it's Gregory Boykin. He actually sent all the -- the paperwork to -- to -- to his lawyer that stated all the things that he needed -- medical documentation, a list of what he wanted for reasonable accommodation, things like that. He had 20 days to get that medical documentation.

Some of the paperwork was sent to me, and one of it actually, I needed (audio interference), so I signed it and sent the signed copy to him and his lawyer and extended the 20 days from that point on instead of from the first time he received it. So I extended the date for him, the date for him to get his medical documentation.

Q Did you ever receive a complete form or a request for accommodation?

A I did not receive medical documentation. He did send me a list of reasonable accommodations, but we can't even talk to them about them until the medical part was taken care of.

Q So where did the medical information go?

A It was supposed to go to occupational medicine to Dr. Ybaben. TJ was informed multiple times to not send medical documentation that had a diagnosis on it to anyone other than occupational medicine. Sometimes he still sent it. He would send it to different groups of people. It wasn't even the same people all the time. Sometimes they'd send it to employee

Deleted: 65¶

relations and Dr. Ybaben and sometimes to me and Dr. Ybaben's office anyway. So it was inconsistent. As far as I know, he did not send in. His lawyer was also sent what he had to specifically did and what they were looking for.

To my knowledge, that was never sent to occupational medicine. He was also supposed to send medical documentation to the Department of Labor for Workers' Comp claims. They contacted me in any more medical documentation, and I said not to me. Dr. Ybaben had sent that also to him. And so they didn't have what they needed either. They ended up denying him.

Q What did you receive from Mr. Zuech or his attorney regarding accommodation requests?

A A form that he had listed out what accommodations he wanted. I actually got two of those. And the second one had more -- more things on it. Again, paperwork from Mr. Zuech was just always different. It was never consistent, never all of it complete. Made it very hard to help him do what he requested.

The doctors' notes sometimes even would be -- would be redacted, so I couldn't tell who an appointment was for, things like that. It was always inconsistent. It was very hard to follow, even if it's what he wanted. I received a doctor's note one time; it was for his son. He wanted sick leave for that. I asked for which son. And he always told me it was

Deleted: 66¶

Deleted: 67¶

none of my business. But if it was his youngest son, it would be paid parental leave. If it was his older son, it would be sick leave.

I would have to contact Dr. Ybaben and have them call the doctor to find out which one it was. Turns out, it's the older son, which would have given him sick leave, which is what he asked for. So even when the information would help him get what he wanted, he made it difficult and always extra work having to go into finding out everything I needed to know to do what he was asking.

Q And this time period, first of 2023, is that when the accommodation discussion was going on?

A Yes, I believe it was the first part of '23.

Q And were you communicating with Mr. Zurich face to face? How were you communicating with him?

A Over email. We had communicated a lot over text. He lost access to his computer because he did not do required training to keep access to his computer. He knew that that was expired about probably two or three months before he left on PPL and had not done it. So -- so eventually, security -- I have nothing to do with that -- security pulled his access along with anybody else that hadn't done that training. So he started emailing through his personal -- his wife's personal account, I believe it was. It was over email.

We get a lot of texting, but at some point he just -- he

said he wouldn't text anymore, which I was okay with, but we were texting because that's how he was wanting to communicate at the time. Or I would text him sometimes because I knew he didn't -- he was on PPL and wouldn't be on his computer all day. So if there was an issue with his timecard, I would text him and say, hey, timecard has a flag; can you go in and fix it. So.

Q Pertaining to Mr. Zuech's request for an accommodation, how -- how did he engage with you? Was he cooperative?

A He turned in the paperwork with lists of accommodations on this.

Q So did he provide the required information necessary to get to that point?

A No. He -- he needed to turn in more of his medical documentation to occupational medicine. And as far as I know, he did not do that. They did not notify me that he -- that yes, he was -- had a disability or whatever the diagnosis was to -- for him to get reasonable accommodations.

Q So was he timely in his responses to the request for information?

A No. He asked for another extension, although I had already extended it, and said that he was having a hard time getting to see a doctor, although he had put in multiple -- multiple requests for sick leave for nine-hour doctor appointments all through the months leading up to that, to the

Deleted: 68¶

time we were doing that.

So according to him, he was having multiple doctor appointments, so I don't know. So stating that he couldn't get with the doctor did not seem reasonable.

Q Did you ever feel like you had enough information that you could have a conversation about what accommodation would be appropriate, if any?

A No, I did not. I was waiting on occupational medicine to tell me that, yes, he -- he qualified for reasonable accommodations.

Q Did you ever deny an accommodation request by Mr. Zuech?

A I denied giving another extension of time and let him know that when he got all of his paperwork together and had his documentation, that we could reengage in the process. And he never asked to reengage.

Q Was at the end of your conversations with him about an accommodation?

A I believe so.

Q And when was that?

A I don't remember the exact date. I believe it was sometime after the first of the year. There was, like I said, multiple -- multiple things going on with not only that, with grievances in the Union, with Depart of -- you know, Workman's Comp, with EEO things, the environment. Everything was just happening pretty much all together. So I don't remember the

Deleted: 69¶

date.
Q But was it the same time frame? Can you pin it to any other event on the timeline?
A It was -- I believe it was before he made these statements because he was -- I was still communicating with him instead of Thomas. So it was before that.
Q But when you say statement, do you mean the statement about killing his supervisor?
A Yeah.
Q And I take it that at that point you didn't communicate with him any further; is that right?
A Not -- not really. Thomas did go -- I can't believe -- remember if he was TDY or on parental leave. But he did tell him he would need to send his request, daily request for annual leave in lieu of sick leave to me while he was gone so I could get it reported and for his timecard. I did have to start doing his timecard because he had -- he did not have access to a computer so he could do (audio interference).
Q Would this had been in early 2023 when --
A Yes, February, March time frame -- March, April.
Q Of 2023?
A Yes.
MR. SMITH: I have no further questions at this point, Judge.
JUDGE BROOKS: Thank you.

Deleted: 70¶

Deleted: 71¶

Mr. Holdsworth?

MR. HOLDSWORTH: Yes, thank you.

CROSS-EXAMINATION

BY MR. HOLDSWORTH:

Q Good afternoon, Ms. Masero. Can you hear me okay?

A Yes, sir.

Q All right. So it sounds like you became the supervisor in this area in October -- around October of 2021, correct?

A Yes.

Q And prior to that, were you a program manager in the same area?

A Yes, sir. I was.

JUDGE BROOKS: I didn't get the question.

MR. HOLDSWORTH: Oh, sorry.

BY MR. HOLDSWORTH:

Q Prior to becoming the supervisor, were you a program manager in the same area?

A Yes, sir. I was.

Q And about how long have you been the program manager?

A I would say about three years. I believe I went over in 2017. I was a program manager until I became a supervisor.

Q Okay. So you were a -- a program manager when the COVID pandemic hit in, let's call it March of 2020; is that correct?

A Yes, sir.

Q All right. And if you know, was -- was Mr. Zuech, perhaps

everyone else in the area, where they sent home during the -- work at home during the COVID pandemic?
A Yes, sir.
Q For about how long (audio interference) --
JUDGE BROOKS: Is there a question?
BY MR. HOLDSWORTH:
Q Do you recall about how long that stay-at-home requirement continued?
A Oh --
Q Let me ask you this. Was it still in effect when you became the supervisor in October of 2021?
A No. We were coming back into the office two days a week when I became the supervisor.
Q So, was it a graduated return to work, starting out in two days, and then eventually go back to the regular four or five days a week?
A It started out two days -- sorry. It started out two days a week, and then we went to three. So we are still in a hybrid telework situation. So we don't work for ops. Management comes in five days a week, but an employee come in three days a week right now.
Q All right. And during the time that Mr. Zuech was at home because of the COVID pandemic and the other staff, I guess, were they able to do their -- their work?
A At the beginning, it was -- we couldn't get into systems,

Deleted: 72¶

Deleted: 73¶

things like that. It took a long time to where people could get into things and do their work. Yes, for -- people were getting some work done.

Q All right. Now, you -- you talked about your concerns about -- about knowing when Mr. Zuech and other employees would take leave because of workload issues. I take it that includes both the work that the individual, who might be taking the leave, has responsibility to perform, as well as how it might affect coworkers if coworkers had to cover for some employee that was absent for a period of time, correct?

A I'm sorry. You broke up on part of that, so I'm not sure I got the whole question.

Q Sure. Let me try and get closer to the mic. So the -- one of the concerns about knowing ahead of time when employees would take or want to take leave of any kind is so you could manage the workflow and workload in the office, correct?

A Yes, sir.

Q And -- and that would include knowing the workload that an individual, who might be absent had to do, as well as figuring out what coworkers might be able to do to cover for that absent employee, correct?

A I'm sorry. I'm not sure exactly what you're asking me. So that would figure out -- I'm sorry.

Q Yeah, well, I'm maybe not asking a good question. But as a supervisor, you want to make sure that the workload that your

Deleted: 74¶

area has gets completed, correct?
A Yes, sir.
Q So if somebody -- if some employee is absent for a period of time, you need to make arrangements to cover that absent employee's workload?
A Yes, depending on how long they're gone.
Q Sure, sure. Just a short time, maybe the the work isn't transferred to some other employee to do, it's just not done for a few days. But if -- if an employee is going to be absent for several weeks or even several days, then some other employee might -- you might ask some other employee to cover that absent employee's workload?
A Yes. If something needs to be answered while they're gone, we do have leads that can answer some things for employees if they're gone. As far as getting into systems and doing some work, if it's just going to be a few days, that usually can wait. If -- if an emergency comes up, if we have a CASPER that comes down from upper management or big Air Force or whatever that has to be answered, then yes, we do have to have another employee that can go in and answer that question, or we would have to call an employee on leave to answer that question if we can get into it.
A Sure. All right. And as a supervisor, you're in charge of -- of that coverage, making sure there is coverage?
A Yes, sir.

Deleted: 75¶

Q All right. Now, with respect to the paid parental leave benefit, as I understand it, that's -- that's kind of like FMLA in the private sector, except it's paid for in the federal sector; is that correct?
A So paid parental leave is paid. It is -- we have FMLA in the Air Force. Paid parental leave is a form of FMLA. So it is a paid form of FMLA.
Q Very good. Thank you.
A Okay. FMLA is normally not paid. You have to use your leave or go without pay. But paid parental leave is actually paid.
Q Right. All right. And is there a requirement to get approval for paid parental leave ahead of time and if it's used?
A The requirement for paid parental leave is that you are having a life event around having a baby, having an adoption, I believe, placing a foster child in your home. Those are the requirements to qualify for paid parental leave.
Q Right. I understand that. But is there advance notice required to be able to use paid parental leave? In other words, do you have to give a month advance notice, six months advance notice, or just say a baby is born? You can say, I want to take paid parental leave for some period of time.
A I think that -- I -- I couldn't tell you if there is an exact time, but you would need to let your supervisor know that

you are having a baby and are going to be gone for three months prior to just calling that day and say, hey, I had a baby. I'm going to be gone for three months.

There is paperwork involved. There's -- there's an office or organization like I said, to send that paperwork to that Mr. Boykins is over. He is over that program for paid parental leave. So yes, you do have to give some notice for that.

Q Certainly, that's the courteous thing to do, to give as much notice as possible. You'd agree with that?

A Do I agree with it being a courteous thing?

Q Yes.

A When you have a job that requires things to be done, then I think it's more than a courtesy. I think you do have to let your supervisor know that you're going to be gone and with as much advance notice when you know as you can. Things have to be programed or have to be prepared. Things have to be planned for that.

Q All right. Now, this -- this issue, as you testified, came up I guess at the beginning of the year of 2022 when you were working with Mr. Zuech about the -- his projected leave for the coming year of 2022. And he had indicated that he was going to be wanting to use some paid parental leave in the middle of the year when his baby was going to be born.

And then, the issue or a concern developed when on his leave calendar, he had the long period, three months of paid

Deleted: 76¶

Deleted: 77¶

parental leave and then returning just for a few days, and then going on that annual leave or taking quite a bit -- two or three weeks of annual leave in October for his annual hunting trip. You had a -- had a major concern with him being gone for that length of time, correct?
A I didn't have a concern with him being gone for paid parental leave. I had a concern with him after being gone for paid parental leave, being gone for another extended period of time on annual leave.
Q Sure. Right. And you explained why. Did you tell him that if he took the 12 weeks of paid parental leave consecutively, that you would not approve his annual leave in October -- for the month of October he was wanting to use.
A I'm sorry. You're -- you're lagging and breaking up a little bit. I can't -- I didn't quite catch all of it.
Q Okay. Let me -- let me try and get a little bit closer to the mic.
A Thank you. I don't hear very well on top of that, so --
Q Well, I want to make sure you hear. So if you need me to repeat anything, no worries; just tell me. So my question is did you tell Mr. Zuech that if he took the 12 weeks of paid parental leave as he was planning on taking it consecutively, that you would not approve his request for annual leave in October?
A So I did not say, if you took paid parental leave. I said

Deleted: 78¶

that I did not think it would be fair to approve annual leave for a half a month after he had been gone for an extended -- extended period of time and only being back for four days. Workload does have to be considered when we approve annual leave.

Q Sure. And at that time, so this is, you know, 2022. Mr. Zuech's position was equipment specialist. He was not a lead; is that correct?

A I'm sorry. He was not a lead? Is that what you said?

Q Yes.

A No, he was not a lead.

Q And when -- was there a lead equipment specialist in the office when he was out?

A We had a new one starting. I believe he started just a little bit after TJ left.

Q That was Joe Webb.

A Yes, sir.

Q So until Mr. Webb came on, there had not been a lead equipment specialist in the area -- in your area?

A Not for a little while, no. I don't remember exactly how long. We had one that took a job in another organization.

Q Okay. But soon after -- and I take it soon after this, Mr. Zuech started his paid parental leave in early July, Mr. Webb came into your area as the lead equipment specialist?

A Yes, he did.

Q Okay. And Mr. Webb had had some experience as an equipment specialist in a different area, correct?

A He did. He came from supply chain as an equipment specialist. Their job is a little bit different than the equipment specialist in the FOA, which is -- which is us. They do -- they have different tasks. There are some things that are the same, but there's a lot of different tasks between the two areas. And so there were some new systems that Mr. Webb had to learn. He had to learn our program and things like that. So he still had a learning curve.

Q Sure. And then, was it at about the same time that another equipment specialist, I think her name is Wendy, that is -- that comes into your area?

A Yes. She came in two or three, maybe four weeks before TJ went on PPL. She did not have any equipment specialist experience.

Q So she had to be trained in the job. But --

A Yeah.

Q Okay. But her first job was an equipment specialist, correct?

A Yes, sir.

Q Now, with respect to the -- you finding out about the -- the dream that TJ -- I'll just call him TJ from here on out -- had reported, how did you find out about that? Sounded like it was told to you by the security people?

Deleted: 79¶

A No, sir. I was trying to get -- TJ had filed a Workman's Comp claim with the Department of Labor. I was trying to navigate that. There was a lot of information and a lot of time with that step to answer my part of that. I was asking Labor Relations and Employee Relations, that group over there, if they knew anything about that, if they had ever dealt with that.

One of them said that they had a new employee, which was Laura Haislip. I didn't know her. I think it was her last name. I didn't know that her at the time or had never heard her name at the time. But Ashley Zorko thought that she maybe could answer some of those because she had done that work. I believe Ashley was talking to somebody about it, and Laura heard her talking about the case, recognized the name -- TJ's name. I believe she recognized your name I thought she said even, and said that was the same person, TJ was the same person that had told her -- had made that statement to her.

Q Okay.

A Ashley let me know; I let my supervisor know; it went up the chain and to security.

Q Thank you. So you -- you heard it directly from Laura Haislip then?

A No. I heard it from Ashley Zorko, who had talked to Laura. And Laura had told her about it and then Ashley let me know so I could let my managers know.

Deleted: 80¶

Deleted: 81¶

Q All right. All right. And it was -- you were asked questions about the requirement of Mr. Zuech to have a security clearance, or at least a person who is an equipment specialist in that position, they have to have a security clearance is what I understood, correct?
A Yes. I'm not aware of any position in the Nuke Weapons Center that doesn't have to have that or I think mostly base-wide, you have to have that. In some positions, maybe you don't. But I don't know of any in our area that you don't have to have a clearance, a security clearance.
Q All right. And you found out that Mr. Zuech's security clearance had been suspended. You'd agree with me that as far as you know, it has not been denied; it has just been suspended?
A I -- I don't know where that process is. That is way above where we're at that decides that. So what -- so whether it's been denied or whatever or permanently suspended, I don't know.
Q Now, you mentioned that there were some aspects of his job, the job of equipment specialist that I guess equipment specialists do without needing a security clearance, correct?
A Correct. There are some aspects that -- that he can could do that doesn't require him to go into a classified area. However, his position is required to have a security clearance. So without that security clearance, he cannot hold that

position regardless of if he goes into classified areas or not.

Deleted: 82¶

Q Sure. All right. And did you have any involvement -- did you have any involvement in the decision by the base to issue a barment order to Mr. Zuech?

A Did I have any what? I'm sorry.

Q Any involvement in that decision?

A No. No, not that I recall. That wouldn't be my decision.

Q So you were not interviewed or talked to by anyone associated with making the decision to issue the barment?

A Not that I remember. No, sir; I don't think so. I don't think anybody -- and I didn't get interviewed. I don't remember being asked any questions. The statement came from Laura, once that was made and Security found that out, they took all that over.

Q Sure. Now, it's true, isn't it, that Mr. Zuech never made a -- a threat to you in person to take any -- to cause any harm to you?

A He -- I'm sorry. He didn't -- the question is, he didn't make a verbal threat to me?

Q Any kind of a threat to you in any meeting that he had with you?

A No.

Q And he didn't make any threats to you through email or text messages?

Deleted: 83¶

A No.
Q Didn't make any threat in any way towards you, correct?
A Besides the statements that he made, he -- he didn't contact me and make a threat, no.
Q And the statement that he made was that he had had a dream, correct?
A Yes. My understanding of what Laura said, he said he had a dream.
Q Now, you also talked about that the -- the colonel, who I guess I'm referring to by the colonel, the base commander, locked your building down?
A So our -- not the base commander, our colonel in our building that's over our division, locked our building zone.
Q Okay. And then there was an email that was sent to the employees that worked in that building --
A Yeah.
Q -- letting them know what was going on?
A Letting them know that -- that there had been a statement made. And that they were I believe it said to someone in RS/RV, which is our area, and that they were locking the building down, that they take those kinds of things very seriously. To be diligent -- diligent to question anybody in the building that you didn't think should be there, those kind of basic safety things.
Q Do you recall the email saying anything about an active

shooter?
A About an active shooter?
Q Correct.
A No, sir. It did not say anything about an active shooter. It may have -- they may have sent standards -- I can't remember. A lot of times they send standard safety things out, which would include everything. I don't remember if they sent that with that or not, but the email body itself did not say anything about an active shooter.
An active shooter would not be other -- would not be sent out if we weren't having an active shooter, other than when they do safety training and things like that. They wouldn't -- they would not say we had an active shooter if there was not one.
Q Okay. Just a couple of other questions. With respect to the accommodation that the questions you were asked by Mr. Smith about providing or discussing accommodations with TJ, do I understand it correctly that you had sent him some paperwork, he filled it out, but not completely, that you did grant one extension for him to be able to finish up the -- the paperwork, the medical information needed, but then denied a request for a second extension. Do I understand your testimony correctly to that effect?
A Yes. So yes. The first -- the first due date it was due, the medical documentation was due within 20 days. And instead

Deleted: 84¶

Deleted: 85¶

of going twenty days from the time it was sent to you, I resent another paper signed later, and I extended it out 20 days from that date.

Q All right. And then, when Mr. Zuech requested an additional extension, that additional extension request was denied by yourself; is that correct?

A Yes.

Q Okay.

A However, I did let him know that once he got his medical documentation, he could reengage.

Q Sure. I mean, the 20 days -- I mean, there's no real -- if you -- no real significance in that 20 days. That's just a way of getting the process going forward?

A That's -- I believe that's part of the process. And -- and in that process, you have 20 days to get, from that paperwork, to get your medical documentation, just the same as anything else that you have 30 days to get something accomplished in or 10 days to get something accomplished in. That's one of the things that (audio interference). It's not something I put on there.

Q Sure.

MR. HOLDSWORTH: No -- no further questions, Your Honor.

JUDGE BROOKS: Thank you.

Mr. Smith?

Deleted: 86¶

MR. SMITH: I have no further questions, Judge. Thank you.

JUDGE BROOKS: Thank you.

Okay. This will conclude the witness's testimony.

For the duration of this proceeding, you are instructed not to discuss the substance of your testimony with anybody. Thank you for coming in today. And you are free to go.

THE WITNESS: Thank you.

JUDGE BROOKS: Thank you.

The time is 12:39 p.m. Let's go off the record.

(Off the record at 12:39 p.m.)

JUDGE BROOKS: The time is 1:08 p.m. We are back on the record. Appearing now as a witness is Aimee Tarbet. Ms. Tarbet, I'm David Brooks, the administrative judge assigned to decide this matter. Do you have any objection to testifying under oath?

MS. TARBET: No, sir.

JUDGE BROOKS: Okay. During your testimony, if you have questions or are confused, you should direct any questions you have to me. Would you please raise your right hand for the oath?

AIMEE TARBET, AGENCY'S WITNESS, SWORN

(Witness testifies telephonically)

JUDGE BROOKS: Thank you. For the record, would you